Gary GRAHAM, Petitioner–Appellant,

v.

James A. COLLINS, Director, Texas Dept. of Criminal Justice, Institutional Division, Respondent–Appellee.

No. 88–2168.

United States Court of Appeals, Fifth Circuit.

Jan. 3, 1992.

Douglas M. O'Brien, Houston, Tex., for petitioner-appellant.

Robert S. Walt, Asst. Atty. Gen., Austin, Tex., for respondent-appellee.

Before CLARK, Chief Judge, REAVLEY, POLITZ, KING, GARWOOD, JOLLY, HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHÉ, WIENER, and BARKSDALE, Circuit Judges.*

GARWOOD, Circuit Judge:

A panel of this Court previously affirmed the district court's denial of Gary Graham's habeas corpus petition challenging his Texas capital murder conviction and death sentence. *Graham v. Lynaugh*, 854 F.2d 715 (5th Cir.1988). Thereafter, the United States Supreme Court, in *Graham v. Lynaugh*, 492 U.S. 915, 109 S.Ct. 3237, 106 L.Ed.2d 585 (1989), issued a per curiam order that granted Graham's petition for writ of certiorari, vacated the judgment of this Court, and remanded the case to this Court "for further consideration in light of *Penry v. Lynaugh*," 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Pursuant to that remand order, a panel of this Court reconsidered the case, and, by a divided vote, vacated Graham's death sentence, the

---

* Judges Emilio M. Garza and Harold R. DeMoss, Jr. were sworn in after this case was argued to the En Banc Court and elected not to participate in this en banc decision.

panel majority determining that the Texas capital sentencing system was unconstitutionally applied in Graham's case because the jury at the sentencing phase of his trial, having been given no special instructions, was not able to adequately consider and give effect to Graham's youth as a mitigating factor. *Graham v. Collins*, 896 F.2d 893 (5th Cir.1990). Having ordered rehearing en banc, *id.* 903 F.2d 1014 (5th Cir.1990), we have again reconsidered the case in light of *Penry* and, disagreeing with the panel majority's determination in this respect, we now reinstate our former affirmance of the district court's denial of habeas relief.

## Procedural History

Over his plea of not guilty, Graham was convicted by a Texas court jury in October 1981 of the offense of capital murder, the May 1981 intentional killing of Bobby Lambert by shooting him with a pistol while in the course of robbing or attempting to rob him. Texas Penal Code, art. 19.03(a)(2). At the sentencing phase of the trial, the jury answered in the affirmative each of the three special issues provided for in Texas Code of Criminal Procedure, art. 37.-071(b), and Graham was accordingly sentenced to death.[1] On direct appeal, Graham's conviction and sentence were af-

---

1. The 1988 and 1990 panel opinions in this case erroneously indicated that only the first two issues specified in art. 37.071(b) were submitted. *See, id.*, 896 F.2d at 898 n. 4 and 854 F.2d at 718.

    Until 1991, sections (a) through (e) of art. 37.071 provided, as they did also in 1981, as follows:

    "(a) Upon a finding that the defendant is guilty of a capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to death or life imprisonment. The proceeding shall be conducted in the trial court before the trial jury as soon as practicable. In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or of the State of Texas. The state and the defendant or his counsel shall be permitted to present argument for or against sentence of death.

    "(b) On conclusion of the presentation of the evidence, the court shall submit the following three issues to the jury:

    "(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

    "(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

    "(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

    "(c) The state must prove each issue submitted beyond a reasonable doubt, and the jury shall return a special verdict of 'yes' or 'no' on each issue submitted.

    "(d) The court shall charge the jury that:

    "(1) it may not answer any issue 'yes' unless it agrees unanimously; and

    "(2) it may not answer any issue 'no' unless 10 or more jurors agree.

    "(e) If the jury returns an affirmative finding on each issue submitted under this article, the court shall sentence the defendant to death. If the jury returns a negative finding on or is unable to answer any issue submitted under this article, the court shall sentence the defendant to confinement in the Texas Department of Corrections for life."

    The above provisions are the same as when the statute was first enacted in 1973 (except that by 1981 amendment the word "three" was inserted in the opening clause of section (b)).

    In May 1991 the Texas Legislature passed two bills amending art. 37.071. S.B. 880, ch. 838, 72nd Leg., R.S.1991, extensively amends the Texas capital sentencing procedure, including art. 37.071, and specifies an effective date of September 1, 1991, but is expressly made applicable "only" to offenses "committed on or after September 1, 1991." S.B. 880, § 5. The changes made by S.B. 880 § 1 to art. 37.071 include the entire elimination of the former first and third special issues (the former second special issue is retained verbatim in all cases), provision for a new special issue where the jury charge allowed the defendant to be found guilty under the law of parties, and provision in all cases for the following new special issue:

    "Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed."

    If all issues submitted are answered adversely to the defendant, the sentence is death; otherwise, the sentence is life imprisonment. S.B. 880 was finally passed May 17, 1991, and was filed without the Governor's signature on June 16, 1991. The other bill, H.B. 9, ch. 652, 72nd Leg., R.S.1991, was finally passed May 27, 1991, and was signed by the Governor June 16, 1991. Sec-

firmed by the Texas Court of Criminal Appeals in an unpublished opinion. Graham subsequently sought habeas corpus relief in the Texas courts. After holding an evidentiary hearing on Graham's allegations, the convicting trial court recommended denial of relief, transmitting to the Court of Criminal Appeals findings and conclusions rejecting Graham's contentions. The Court of Criminal Appeals thereafter denied relief pursuant to an unpublished opinion.

Graham then brought the present proceedings under 28 U.S.C. § 2254 in the district court. That court denied relief without an evidentiary hearing, and denied stay of execution and a certificate of probable cause. A panel of this Court granted an interim stay, but ultimately denied Graham's application for certificate of probable cause. *Graham*, 854 F.2d 715. Judge Jolly, in his opinion for the panel consisting of himself and Judges Reavley and King, considered and rejected seriatim each of Graham's several claims. In part IIB of the opinion, the panel dealt with Graham's contention that the Texas statutory special issues, which mandate the death penalty if all are answered affirmatively, *see* note 1, *supra*, do not permit the jury to adequately weigh mitigating circumstances when formulating their answers. *Id.* at 718–20. The factors Graham relied on as mitigating were primarily his youth—he was seventeen at the time of the offense—and certain matters reflected by evidence concerning his childhood.[2] *Id.* The panel relied particularly upon *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988), and concluded by holding that "the jury's verdict ... is consistent with the constitutional requirements outlined in *Franklin* and other precedents." *Id.* at 719.[3]

■■■■ Following the Supreme Court's remand for reconsideration in light of *Penry*, the panel again grappled with this difficult issue.[4] Judge Reavley, for the panel majority, held that:

"The mitigating evidence that Graham introduced during sentencing included his youth and his difficult childhood. Graham argues this evidence is relevant

---

tion 9 of H.B. 9 provides that art. 37.071 "is amended to read as follows" setting it out in full in the *same* form as it existed previously (or before May 1991) with only minor, technical changes (a new section 1 is added providing that the judge shall sentence the defendant to life imprisonment if the state does not seek the death penalty; the remainder of art. 37.071 is put into its section 2, stated to apply only if the state seeks the death penalty; the only other changes are from "upon" to "on" at the beginning of section 2(a) and using the current designation for the former Texas Department of Corrections in section 2(e)). H.B. 9 specifies September 1, 1991 as its effective date (section 16), and its section 15(a) states: "(a) The changes in law made by Section 1–9 and 11, 12, and 13 of this Act apply to the trial of a capital offense that commences on or after the effective date of this Act, whether the trial is for an offense committed before, on, or after the effective date." We merely note these 1991 enactments, and express no opinion with respect to whether, for offenses committed on or after September 1, 1991, the controlling form of art. 37.071 is as provided in S.B. 880 § 1 or H.B. 9, § 9.

**2.** The panel also, among other things, rejected Graham's contention that the Eighth Amendment prohibited execution for an offense committed when the defendant was less than eighteen years old. *Id.* 854 F.2d at 717–718.

**3.** The 1988 panel did, however, observe (*id.* at 720, n. 8):

"We do not suggest that this area of the law is devoid of wrinkles. The Supreme Court has recently granted certiorari in the case of *Penry v. Lynaugh*, 832 F.2d 915 (5th Cir.1987), *cert. granted,* [487] U.S. [1233], 108 S.Ct. 2896, 101 L.Ed.2d 930 (1988). In *Penry*, our court closely scrutinized evidence of Penry's mental retardation and concluded that there was some doubt whether the Texas statute permitted this evidence to be considered in answering the sentencing questions. 832 F.2d at 925."

**4.** With respect to the other issues in the case, the 1990 panel opinion observed:

"In remanding this case, the Supreme Court neither expressed nor suggested disagreement with any part of our prior opinion other than that relating to Graham's argument that the Texas statutory sentencing procedure does not allow the jury to consider fully the relevant mitigating circumstances, which is discussed in section IIB of that opinion. Accordingly, with the exception of section IIB, we reinstate our prior opinion." *Id.* 896 F.2d at 894. We agree, and reinstate this portion of the 1990 panel opinion. For the same reason, we similarly deny relief with respect to Graham's contentions addressed in footnotes 5, 7, and 9 of the 1988 panel opinion. *Id.* 854 F.2d at 718 n. 5, 719 nn. 7 & 9.

beyond the scope of the special questions and that, because no additional instructions were given, the Texas statute was unconstitutionally applied in his case. Because of Graham's age, we agree." *Id.* at 897.[5]

Judge Jolly, in his 1990 dissent, concluded that the second special issue adequately encompassed any mitigating aspects of youth that the jury must constitutionally be free to consider, as Graham's youthfulness was such a factor only to the extent his offense was a product of it, and youth was necessarily a transitory condition that the jury could fully take into account "by giving a negative answer to the future dangerousness inquiry of the second special issue." *Id.* at 899.

### Context Facts

At the guilt-innocence phase of the trial, Graham's defense was essentially only one of insufficient identification. The state presented several witnesses to the shooting, which occurred at about 9:30 p.m. on Wednesday, May 13, 1981, in the parking lot of a Safeway Food Store in Houston, Texas. The perpetrator, a man wearing black pants and a white jacket, bumped into Lambert, who was carrying a sack of groceries out of the store, and attempted to grab Lambert's wallet. Some of the testimony indicated that there was a brief struggle between the two. Lambert pushed at the perpetrator, and each stepped back; the perpetrator produced a pistol, leveled it at Lambert's chest, and shot him in the heart from a distance of about two to three feet. The perpetrator then fled without being apprehended. Lambert staggered back toward the store, fell, and died on the spot. The perpetrator had been observed in the store when Lambert was there, but had left a few minutes before Lambert did. So far as the evidence showed, the perpetrator acted alone. Only one of the witnesses, Mrs. Skillern, was able to identify Graham as the perpetrator.[6] She ultimately so identified Graham in a May 26 photographic display and in a May 27 police station "line-up," as well as in her open court trial testimony. Defense counsel attacked Mrs. Skillern's identification, both by vigorous cross-examination and by emphasizing in argument the failure of the other witnesses, at least one of whom was closer to the events in question, to make an identification.[7] However, no defense evidence was presented. In closing argument defense counsel did not suggest that the evidence failed to show that the offense charged had been committed, but rather that it failed to show that Graham was the one who committed it.

At the sentencing hearing, no evidence was introduced concerning the offense of conviction. The state introduced extensive evidence showing that on five different days during the week following his murder of Lambert, Graham committed robberies at a total of nine separate locations and in each instance Graham leveled either a pistol or a sawed-off shotgun on the victim. The first of these was on May 14, and the last on May 20. These offenses involved some thirteen different victims, including women aged fifty-seven and eighteen and men aged sixty-four, fifty-seven, eighteen, and other ages. With respect to a few of these occasions, the evidence indicated Graham was using marihuana. In addition to money and personal effects, five vehicles were stolen. Two of the victims were pistol whipped, one of them being shot in the neck. These were the only serious physical injuries. Graham glancingly struck another victim, the sixty-four-year-old man, with the vehicle he was stealing, apparently try-

---

**5.** The 1990 panel majority, though summarizing the evidence presented by Graham respecting his childhood, *id.*, did not address whether that evidence, of itself, would have required some further instruction or jury submission beyond that given. As to the *Penry* issue, the panel only addressed "Graham's age."

**6.** The other witnesses did not testify to anything suggesting that Graham was not (or did not resemble) the perpetrator, but merely stated

that they did not get a good enough look at (or sufficiently recall) the perpetrator's face to make an identification.

**7.** The defense also sought to suppress Mrs. Skillern's testimony on the basis that the photographic display and line-up were unduly suggestive. After an extensive hearing out of the presence of the jury, this motion was overruled.

ing to run over him. The fifty-seven-year-old woman was kidnapped and raped, after which Graham fell asleep in her apartment, she contacted the police and he was arrested there, thus bringing his crime spree to an end. On five of these occasions Graham apparently acted alone; on four others an accomplice (not shown to be of a different age from Graham) was present or nearby, but Graham wielded the weapon. At least six of the separate incidents, including that with the sixty-four year old and the two with the fifty-seven year olds, involved Graham practicing initial successful deception on the victim. The state also introduced testimony of a Texas Youth Council employee that she had been familiar since an unspecified time in 1979 with Graham's reputation in the community for being a peaceful and law-abiding citizen, and that it was bad; she gave no elaboration or specifics whatever and did not state how she acquired this information, except that it was not based on her own personal observation. This was the entirety of the state's evidence at the punishment stage.

The only evidence presented by the defense at the sentencing stage consisted of the testimony of Graham's stepfather, Joe Samby, and his grandmother, Erma Chron. Samby testified that he had been married to Graham's mother for about five years, and had known Graham for about five years. He said Graham was fifteen when he (Samby) first met him. Graham lived with his father, and worked with him, but Samby did not know what kind of work Graham did. Graham would come by Samby's house once or twice a week to visit his mother. Graham had "real, real respect for his mother. He cared about his mother. He was real close to his mama." His mother was present in the courtroom, but Samby explained "she can't do nothing because she is on medication and nervous.

She is the nervous type." Samby stated that he had never known Graham to be a violent person, that Graham had been "real nice, respectable" with him and, when requested to help out around Samby's house, such as by cutting the grass or to "clean up and help his mother," Graham "would do it and be glad to do it for me." Graham was one of four brothers, and had no sisters. Samby had three children of his own living in his house. Graham had two children, one four and the other two. Graham would "buy ... clothes for his children and try to give them food." [8]

Chron testified that her grandson Graham began staying with her intermittently, beginning "when he was around three," because his mother was frequently hospitalized for a "nervous condition" that Chron said was "mental illness." He would stay with his mother when she was not hospitalized. However, at about age eleven or twelve Graham went to live with his father and "he has been with his father ever since." Graham's mother had been hospitalized "at least twenty times." Chron further stated that while Graham was living with her he attended school, "he would go to church all the time and everything. He loved the Lord," and he didn't give Chron "any problems or trouble." Chron also testified that Graham never had any weapons, and "he has never been violent."

Apart from Samby's testimony that he had known Graham about five years and first knew him when Graham was fifteen, which would indicate that Graham was nineteen or twenty when the offense was committed, there was no evidence before the jury as to Graham's age.[9] Nevertheless, each of Graham's two attorneys, in their closing arguments at the punishment stage, argued to the jury, without prosecu-

---

**8.** There was no evidence as to where Graham's children lived or whether Graham was or had been married.

**9.** However, it is undisputed that Graham was in fact born on September 5, 1963, this being reflected in a report of a pretrial psychiatric examination filed in the papers of the case in August 1981, the examination having been ordered by the court on motion of defense coun-

sel. Graham was thus seventeen years and eight months of age when the offense was committed. Records of the late May 1981 line-ups at which Graham was identified, which were not before the jury but were put in evidence only in hearings out of the presence of the jury on suppression motions, also reflect that Graham was seventeen at that time.

tion objection, that Graham was seventeen when his offense was committed.

The first defense counsel's argument included the following:

"We have to make a decision on this young man, Gary Graham. What do we know about Gary Graham? One thing we know about Gary Graham is from May 13 through May 20th he reaped havoc and hell on a lot of people. May 13, 14, 15, 16, 18 and 20th five days. Pure hell. What do we know about Gary Graham? We know that at age 3 he went to live with his Grandmother because his Mother was placed in a mental institution or placed herself in a mental institution. We know he lived on and off with his Grandmother and when she would come out of the hospital he would live with her and when she would go back he would go live with his Grandmother. Draw your own conclusions to that, what type of life he lived. You heard from his Step-father. He stated that Gary Graham would come to his house and visit his Mother every now and then. You heard from his Grandmother, that Gary Graham has 2 children of his own.... Gary Graham is a young man. No doubt about it.... A young man, hasn't even reached 20 years old. Not even 20 years old. He goes on a rage for 7 days, 7 days out of his life. He is not going to ever forget.... I would hope that it was something on the witness stand that you either heard that show some redeeming value. Something in Gary Graham's life to say that possibly he can be rehabilitated. Possibly. And I would urge each and every one of you all that there is a glimmer or a possibility that his life can change, given that opportunity.... Gary Graham, 17 years old, went on a rage for 7 days. What did he do? He harassed people. He stuck guns in their face. He shot an individual and he killed another individual. What was it in response to? Why did he become so aggressive? What makes an individual go on a rage for 7 days? Drugs? Alcohol? Maybe. Life? Maybe...."

Graham's other counsel argued in a similar vein, stating:

"... there are only two answers, and that is a choice. Life or death. Life in the penitentiary at the age of 18 years old. What is the meaning of punishment? Why do we punish.... We are all leaving. Everyone here gets to leave but him. He either goes to live for life in the penitentiary or be prepared for death by injection, and when you look at a young man of his age, what do you think about? What do you think about the years when you think about death. You think about finishing the years of your life back when you are at a point in your life when some people have no direction. Some people have no knowledge of where their [sic] going or what they want to do. Some of us are more fortunate. You also have to look at changes in society. Changes in ages. See, because what you are called upon to do is predict whether some time in the future Gary Graham could become a person fit to return to society. At least he is alive. See, when you are 17 or 20, you are young, hot-to-trot. You are going to set the world on fire one way or the other, right or wrong. When people come in their middle 20's and middle 30's, a change a little bit from your more radical stands to a more somewhat upright posture because you have had not only time to think, but to see what is in the world. Most of the crime is committed by young people. By the time you get to 25 or 35, it's different. 35 and above.... because there is something about human nature that not only changes you, but slows you down as you live. If you live. If you live...."

The prosecution's argument did not refer to Graham's age in any way except to once acknowledge "his youth." The prosecution stressed Graham's killing of Lambert and his other many serious offenses in the following week, stating in part:

"Gary Graham does have direction, and he has shown you that direction. He has shown you that direction in every way that you can possibly look at.... [T]here are certain individuals in our so-

ciety that we have got to look at. And we have got to realize that are not fit to live with us. The evidence beyond a reasonable doubt shows that Gary Graham is not fit to live in this society, that he will constitute a continuing threat to society. Compassion? They ask for compassion. We ask you for his life.... Rights of the individuals of this society. The life of Bobby Grant Lambert. They say look at his youth. When does a human life taken the way he took that life of Bobby Grant Lambert cease to have meaning? It ceases to have meaning when the terror and the degradation of a man such as him holds that life in his hand.... Compassion? Care? Have you just looked at him? ... Death is the only protection that you, as the jury, and society can protect from people and especially Gary Graham. The seeds of our past are the harvest of the future and what seeds has Gary Graham planted? And where has he sowed those seeds? In the fertile earth? No. He buried Bobby Grant Lambert in the earth. His seeds are death. Pain. Suffering. Humiliation. Degradation. What do those things bring? But one thing tell you what Gary Graham is. You have seen his actions. You have heard from the mouths of these people. Deliberate conduct...."

Neither side made any objections to the other's argument. The court instructed the jury in accordance with article 37.071, including informing them that the sentence would be either "death or confinement in the penitentiary for life," and that in answering the three special issues they could take into consideration all the evidence submitted both at the guilt-innocence stage and at the punishment stage.[10] The three special issues called for by art. 37.071(b) were submitted, and each was answered in the affirmative. Neither side objected to the charge or the issues submitted or requested any other or further instructions or issues.[11]

**Discussion**

In *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), the Supreme Court sustained the Texas capital sentencing procedure of art. 37.071. This case requires us to examine what, if anything, remains of *Jurek* and art. 37.071 after *Penry*. To provide context for this examination, an overview of some of the other leading decisions of the Supreme Court in this area is appropriate.

*Context cases*

In *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Court effectively struck down all capital punishment statutes then in place. The crucial votes in *Furman* were those of Justices Stewart and White, who, as Justice Scalia observed in *Walton v. Arizona*, —— U.S. ——, 110 S.Ct. 3047, 3061, 111 L.Ed.2d 511 (1990) (concurring opinion), "focused on the infrequency and seeming randomness" with which the death sentence was imposed under the then existing discretionary sys-

10. The jury was also instructed that the state still had the burden of proof, which never shifted to the defendant, and that "each special issue submitted must be proved by the state beyond a reasonable doubt" and none could be answered "yes" unless all jurors were convinced beyond a reasonable doubt that it should be so answered.

11. Prior to trial, the court had denied defense counsel's motion to "hold article 37.071 ... unconstitutional and void." This motion was grounded on the contention that the special issues called for were too "vague and indefinite," and thus "allow total discretion to a jury to make unfavorable findings against a Defendant, and such findings may be based on any prejudice the jury may have, individually or as a whole." The supporting memorandum ex-

plained that "Article 37.071 leaves with both the judge and the jury a vas[t] residue of discretion which is precisely what the Supreme Court in *Furman* [v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) ] condemned" and argued that "[c]onsequently, the inquiry [of the article 37.071 issues] is fraught with standardless discretion in the hands of the jury."

There was no suggestion in the motion or memorandum that defendant complained of insufficient discretion (or an insufficient vehicle to give effect to it) to determine that the defendant would not receive the death penalty, or that the jury was not given an adequate basis to consider or give effect to its conclusions concerning defendant's age or background. The complaint was indeed the reverse.

tem.[12]  Following *Furman* some thirty-five states adopted new capital sentencing statutes that reduced or narrowed the sentencer's discretion in determining whether or not to impose the death penalty.  The Supreme Court ruled on five of these statutes on July 2, 1976.  *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Jurek; Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976).  *Gregg* sustained the Georgia statute, which directed the sentencer to consider listed and unlisted aggravating and mitigating circumstances, but allowed a death sentence only if at least one listed aggravating circumstance were found.  The Court observed that *"Furman* mandates" that the capital sentencer's "discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action," *id.* 96 S.Ct. at 2932, and warned against sentencing standards "so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in *Furman* could occur." *Id.* at 2935 n. 46.  *Gregg* goes on to note, however, that "the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice."  *Id.* at 2939.  *Proffitt* applied the *Gregg* rationale to uphold the somewhat similar Florida scheme.  *Woodson*, however, struck down the North Carolina statute under which the death penalty was made mandatory for first degree murder, in that case murder during the course of robbery.  The Court noted that among the "constitutional shortcoming[s]" of this statute was "its failure to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant," and that in capital cases the Eighth Amendment "requires consideration of the character and record of the individual offender and the circumstances of the particular offense."  *Id.*, 96 S.Ct. at 2991.  *Roberts* applied the same rationale to invalidate the Louisiana statute under which the death penalty was likewise mandatory for first degree murder.

We turn now to *Jurek*, decided the same day.  There seven justices voted to uphold the Texas scheme as embodied in art. 37.-071, but no opinion attracted more than three votes.  The judgment of the Court was announced in Justice Stewart's opinion, which Justices Powell and Stevens joined, and this opinion has generally been understood as expressing the rationale of the Court's action.[13]  Justice Stewart's opinion summarizes the facts adduced at trial, including evidence that Jurek "22

---

**12.**  Justice Stewart, for example, observed that of those convicted of capital crimes "many just as reprehensible as these, the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed" and that the Constitution could not tolerate systems that "permit this unique penalty to be so wantonly and so freakishly imposed." *Furman*, 92 S.Ct. at 2762–63.  Justice White observed that under the statutes at issue "there is no meaningful basis for distinguishing the few cases in which it [the death penalty] is imposed from the many cases in which it is not." *Id.* at 2764.

**13.**  Justice White, in an opinion in which then Chief Justice Burger and then Justice Rehnquist joined, likewise found the Texas statute constitutional. *Id.*, 96 S.Ct. at 2959–60.  Justice White's opinion quotes the statutory special issues in full and observes that "[t]he statute does not extend to juries discretionary power to dispense mercy, and it should not be assumed that juries will disobey or nullify their instructions." *Id.*, at 2959.

Justice White, joined by then Chief Justice Burger, Justice Blackmun, and then Justice Rehnquist, dissented in *Roberts, id.*, 96 S.Ct. at 3008–3020, and also in *Woodson*.  Justice Blackmun wrote a separate dissent in *Woodson* and did not join Justice White's dissent there.  *Id.*, 96 S.Ct. at 2992–93.  In *Jurek* Justice Blackmun separately concurred in the judgment, with only a brief reference to his *Furman* dissent.  *Jurek*, 96 S.Ct. at 2960.  Justices Brennan and Marshall dissented in *Jurek*, as well as in *Gregg* and *Proffitt*, on the grounds that the death penalty was unconstitutional *per se.*  96 S.Ct. at 2971–2977.  They concurred in the result in *Woodson, id.*, 96 S.Ct. at 2992, and *Roberts, id.*, 96 S.Ct. at 3007, on the same basis.

years old at the time, had been drinking beer in the afternoon" of the offense, and that he "had always been steadily employed since he had left school and that he contributed to his family's support." *Id.*, 96 S.Ct. at 2954. In describing the Texas sentencing procedure, the opinion states that at the punishment phase the jury is "presented with two (sometimes three) questions, the answers to which determine whether a death sentence will be imposed." *Id.* (footnote omitted). It observes that only the first two issues specified in art. 37.071 were submitted, that both were answered yes, "and the judge, therefore, in accordance with the statute, sentenced the petitioner to death." *Id.* The opinion then quotes verbatim the full text of the three issues specified in art. 37.071, and continues by stating "[i]f the jury finds that the State has proved beyond a reasonable doubt that the answer to each of the three questions is yes, then the death sentence is imposed." *Id.* at 2955.

In evaluating the constitutionality of the Texas scheme, Justice Stewart notes that under *Woodson* and *Roberts* "[a] jury must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed." *Id.* at 2956. The opinion then observes that "[t]he Texas statute does not explicitly speak of mitigating circumstances; it directs only that the jury answer three questions," and "[t]hus, the constitutionality of the Texas procedures turns on whether the enumerated questions allow consideration of particularized mitigating factors." *Id.* The Court proceeds to answer this inquiry in the affirmative, but only with regard to the second—the future dangerousness—special issue, because "[t]he Texas Court of Criminal Appeals has not yet construed the first and third questions ... thus it is as yet undetermined whether or not the jury's consideration of those questions would properly include consideration of mitigating circumstances. In at least some situa-

tions the questions could, however, comprehend such an inquiry." *Id.* at 2956 n. 7. In turning to the second special issue, the opinion notes that "[t]he Texas Court of Criminal Appeals has yet to define precisely the meaning of such terms as 'criminal acts of violence' or 'continuing threat to society.'" *Id.* at 2956. It goes on to state (96 S.Ct. at 2956–57):

> "In the present case, however, it [the Texas Court of Criminal Appeals] indicated that it will interpret this second question so as *to allow a defendant to bring to the jury's attention* whatever mitigating circumstances he may be able to show:
>
> "'In determining the likelihood that the defendant would be a continuing threat to society, the jury could consider* whether the defendant had a significant criminal record. It could consider the range and severity of his prior criminal conduct. It could further look to the age *of the defendant* and whether or not at the time of the commission of the offense he was acting under duress or under the domination of another. It could also consider *whether the defendant was under an extreme form of mental or emotional pressure,* something less, perhaps, than insanity, but more than the emotions of the average man, however inflamed, could withstand.' [*Jurek v. State*] 522 S.W.2d [934], at 939–940 [Tex.Crim.App.1975]." (emphasis added).

After briefly considering one other Texas Court of Criminal Appeals decision,[14] Justice Stewart's opinion states "the Texas capital-sentencing procedure guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death." *Id.* at 2957. The opinion concludes by observing:

> "*By authorizing the defense to bring before the jury* at the separate sentenc-

---

**14.** The case considered was *Smith v. State,* 540 S.W.2d 693, 696–97 (Tex.Crim.App.1976), *cert. denied,* 430 U.S. 922, 97 S.Ct. 1341, 51 L.Ed.2d 601 (1977), where the Texas court examined the sufficiency of the evidence to support the jury's affirmative answer to the second special issue. *Jurek,* 96 S.Ct. at 2957.

**1020**

ing hearing whatever mitigating circumstances relating to the individual defendant can be adduced, Texas has ensured that the sentencing jury will have adequate guidance to enable it to perform its sentencing function.... Because this system serves to assure that sentences of death will not be 'wantonly' or 'freakishly' imposed, it does not violate the Constitution. *Id.* at 2958 (emphasis added).

Two years later, in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Court considered an Ohio death sentence imposed for the murder of a pawnshop operator in the course of an armed robbery of his shop while the defendant, an accomplice, waited outside in the getaway vehicle. Under Ohio law, as the Court construed it, the sentencing judge was required to impose the death sentence for the offense unless he found, by a preponderance of the evidence, one of the three statutory mitigating factors, namely (1) that the victim induced or facilitated the offense, or (2) that the defendant committed the offense under "duress, coercion, or strong provocation," or (3) that it was "primarily the product of" the defendant's "psychosis or mental deficiency." *Id.* 98 S.Ct. at 2959, 2966. "No one planned to kill the pawnshop operator in the course of the robbery." *Id.* at 2957. The presentence report reflected that the defendant, a twenty-one-year-old female, had committed "no major offenses" and that in the opinion of a psychologist her "prognosis for rehabilitation ... was favorable." *Id.* at 2959. The sentencing judge found that the offense was not the product of psychosis or mental deficiency, did not address the other two statutory mitigating factors, and sentenced the defendant to death, stating "that he had 'no alternative, whether [he] like[d] the law or not' but to impose the death penalty." *Id.* The plurality opinion by Chief Justice Burger, joined by Justices Stewart, Powell and Stevens, held that "[t]he limited range of mitigating circumstances which may be considered by the sentencer under the Ohio statute is inconsistent with the Eighth and Fourteenth Amendments. ... a death penalty statute must not preclude

consideration of relevant mitigating factors." *Id.* at 2967. The scope of the plurality opinion is unclear. It focuses on the fact that under the Ohio statute the defendant's lack of specific intent to kill "is relevant for mitigating purposes only if it is determined that it sheds some light on one of the three statutory mitigating factors" and that "consideration of a defendant's comparatively minor role in the offense, or age, would generally not be permitted, as such, to affect the sentencing decision." *Id.* at 2966–67. Similarly, the plurality notes that the Ohio statute's "constitutional infirmities can best be understood by comparing it with the statutes upheld in *Gregg, Proffitt* and *Jurek*," *id.* at 2965, and "the statute now before us is significantly different" than those statutes. *Id.* at 2966. More broadly, however, the opinion states that:

"... a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. ... that risk is unacceptable and incompatible with the command of the Eighth and Fourteenth Amendments." *Id.*

If the quoted language concerning "independent" mitigating weight is understood in its most apparent literal sense, the *Lockett* plurality would seem to be wholly inconsistent with *Jurek*, for in *Jurek* it is clear that the Supreme Court understood what the Texas statute so obviously facially provides, namely that although a wide range of evidence concerning the defendant's character and record and the circumstances of the offense is to be considered in determining whether or not to impose the death penalty, the consideration of that evidence is not "independent" of such relevance as the jury may find it has to the special issues. But such a construction of *Lockett* is not only much broader than the facts there, but is also at war with the plurality's statement that the Ohio statute was "sig-

nificantly different" than the Texas enactment and that the former's deficiencies "can best be understood by comparing it with" the valid Texas statute.

Justice Blackmun concurred specially in *Lockett,* "for a reason more limited than that which the plurality espouses," namely that the Constitution forbids imposition of "the death sentence for a defendant who only aided and abetted a murder, without permitting *any* consideration by the sentencing authority of the extent of her involvement, or the degree of her *mens rea,* in the commission of the homicide." *Id.* at 2969 (initial emphasis added). Justice Marshall likewise concurred specially, adhering to his view that the death penalty was always unconstitutional, but also observing that the defendant "was sentenced to death for a killing that she did not actually commit or intend to commit" pursuant to "a statutory scheme that precluded *any effective* consideration of her degree of involvement in the crime, her age, or her prospects for rehabilitation." *Id.* at 2972 (emphasis added). Justice White concurred specially, expressly disagreeing with the plurality opinion, but concluding that "it violates the Eighth Amendment to impose the penalty of death without a finding that the defendant possessed a purpose to cause the death of the victim." *Id.* at 2983.[15] Then Justice Rehnquist dissented, and Justice Brennan did not participate.

The next significant decision in this context is *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), where the Court struck down a death sentence imposed on a sixteen year old, whom the sentencing judge found posed a continuing threat of violence to society. There, Justice Powell's plurality opinion focused on the fact that the sentencing judge appeared to have determined that "in following the law" he was not permitted to "consider" the defendant's troubled background, the evidence showing the defendant's neglectful and turbulent family environment, excessive physical punishment by his father, that the defendant was emotionally dis-

turbed and his mental and emotional development were at a level several years below his chronological age, and that the offense was a product of these circumstances. *Id.* 102 S.Ct. at 873 & nn. 1 & 2, 877. The opinion also observed that the Oklahoma Court of Criminal Appeals, in reviewing the sentence, had noted that defendant's contention " 'that the killing was in actuality an inevitable product of the way he was raised,' " but held that " 'the petitioner's family history is useful in explaining why he behaved the way he did, but it does not excuse his behavior.' " *Id.* at 874. The plurality opinion states that under *Lockett* "the sentencer in capital cases must be permitted to consider any relevant mitigating factor," *id.* at 875, and that "the evidence Eddings offered was relevant mitigating evidence." *Id.* at 877. The rule of *Lockett* was violated because the trial judge "found that *as a matter of law* he was unable even to consider the evidence" and the state appellate court "took the same approach," *id.* at 876, so that "it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings proffered on his behalf." *Id.* at 877.

Justice O'Connor did not join Justice Powell's opinion, but specially concurred, stating that "the reasoning of the plurality opinion in *Lockett* compels a remand so that we do not 'risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.' " *Eddings,* at 879 (quoting *Lockett* ). A remand was necessary for this reason because "it appears that the trial judge believed that he could not consider some of the mitigating evidence in imposing sentence." *Id.* Then Chief Justice Burger, joined by Justices White, Blackmun and then Justice Rehnquist, dissented.

In the case *sub judice,* not only was no evidence tendered by the defense excluded, but the trial court's instructions expressly authorized consideration of all evidence admitted in answering the special issues, and, unlike *Eddings,* there is nothing to affirm-

---

**15.** A modified version of this view subsequently gained majority support. *See Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); *Tison v. Arizona,* 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

atively indicate that the jury believed they could not consider any of the evidence for that purpose.

The Court applied *Eddings* in *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), to reverse a death sentence because at the sentencing hearing the trial judge had excluded as irrelevant the defense's proffered "testimony of two jailers and one 'regular visitor' to the jail to the effect that petitioner had 'made a good adjustment' during his time spent in jail," and the prosecutor had nevertheless argued to the jury "that petitioner would pose disciplinary problems if sentenced to prison and would likely rape other prisoners." *Id.* 106 S.Ct. at 1670. Justice White's opinion for the Court states that under *Eddings* the capital "sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'" *Skipper* at 1671 (quoting *Eddings*). Justice White went on to hold:

> "Consideration of a defendant's past conduct as indicative of his probable future behavior is an inevitable and not undesirable element of criminal sentencing: 'any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose.' *Jurek v. Texas,* 428 U.S. 262, 275, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976).... [E]vidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating. Under *Eddings,* such evidence may not be excluded from the sentencer's consideration." *Id.* (footnote omitted).[16]

Justice Powell, with then Chief Justice Burger and then Justice Rehnquist joined, concurred in the result, conceding that reversal was required on due process grounds because the death sentence had been sought on a factual basis the defendant had not been allowed to rebut, but rejecting the notion that *Eddings* and *Lockett* applied. *Id.* at 1673–1675. Justice Powell—author of the *Eddings* plurality—concluded that the States retained authority "to determine what particular evidence within the broad categories described in *Lockett* and *Eddings* is relevant in the first instance," that these determinations should be respected provided "they do not foreclose consideration of factors that may tend to reduce the defendant's culpability for his crime," *id.* at 1674, and that "States are only bound to consider those factors that are central to the fundamental justice of execution." *Id.* at 1675. Nothing in Justice White's opinion appears inconsistent with these general premises.[17]

In *Hitchcock v. Dugger,* 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), Justice Scalia, for a unanimous Court, reversed a Florida death sentence where the record "could not be clearer that the advisory jury was instructed not to consider, and the sentencing judge refused to consider, evidence of nonstatutory mitigating circumstances." *Id.* 107 S.Ct. at 1824. The defendant had requested that there be taken into account "the testimony concerning petitioner's family background and his capacity for rehabilitation," matters which were not included in the statutory mitigating circumstances. *Id.* at 1824.[18] The

---

16. The opinion concludes that because the excluded evidence was the only evidence from disinterested witnesses tending to contradict the prosecutor's argument, "it appears reasonably likely that the exclusion of evidence bearing upon petitioner's behavior in jail (and hence, upon his likely future behavior in prison) may have affected the jury's decision to impose the death sentence." *Id.* at 1673.

17. Indeed, Justice White's opinion indicates evidence such as that of good personal hygiene practices while in prison might properly be treated as irrelevant. *Id.* at 1672 n. 2.

18. The Florida statutory mitigating circumstances as set out in the opinion, *id.* at 1823 n. 3, did not include potential for rehabilitation or lack of future dangerousness or any analogous consideration (nor any general or residual mitigation category). Nor did they include matters such as troubled family history or turbulent upbringing (here, evidence that as a child the twenty-year-old defendant had the habit of inhaling gasoline fumes, as an apparent result of which his mind tended to wander, and that he was one of seven children of a poor family whose father died of cancer), although they did include whether the crime was committed while "under the influence of extreme mental or emo-

Court held that "the exclusion of mitigating evidence of the sort at issue here renders the death sentence invalid," citing *Skipper* and *Eddings. Id.*[19]

The next year the Court revisited the Texas statute in *Franklin,* where it found no constitutional error in the refusal of a requested jury instruction that any of the special issues could be answered negatively "if you find any aspect of the Defendant's character or record or any of the circumstances of the offense as factors which mitigate against the imposition of the death penalty." *Id.* 108 S.Ct. at 2325 & n. 4. The only mitigating evidence was that defendant's prison service for several years both before and after the offense was without any disciplinary incident. *Id.* at 2324. Justice White's plurality opinion, joined by the Chief Justice and Justices Scalia and Kennedy, observed that "the Texas courts have expressed resolute adherence to *Lockett*" in the decade since it was decided, *id.* at 2326, and rejected the contention, based on the "'independent' mitigating weight" language of *Lockett,* that defendant's "prison disciplinary record reflected so positively on his 'character' that the instructions ... should have provided the jury with a 'mechanism through which to impose a life sentence' even if the jury otherwise believed that both Special Issues should have been answered 'yes.'" *Id.* at 2329. Justice White also expressly rejected the claim that the Constitution required that the jury, even if it answered the special issues affirmatively, be "still entitled to cast an 'independent' vote against the death penalty," stating that "this submission is foreclosed by *Jurek,* which held that Texas could constitutionally impose the death penalty if a jury returned 'yes' answers to the two Special Issues" and that "*Jurek* has not been overruled; and we are not inclined to take any such action now." *Id.* at 2330. The plurality opinion asserts that "*Lockett* does not hold that the state has no role in structuring or giving shape

to the jury's consideration of ... mitigating factors," *id.,* and that "we have never suggested that jury consideration of mitigating evidence must be undirected or unfocused." *Id.* at 2331. Recognizing that "two lines of cases"—*Eddings* and *Lockett* on the one hand and *Gregg* and *Proffitt* on the other—"are somewhat in 'tension' with each other," Justice White notes that nevertheless "the Texas capital sentencing system has been upheld by this Court ... precisely because of the way in which the Texas scheme accommodates *both* of these concerns." *Id.* He continues by stating:

> "Doubtlessly this is why this Court originally approved Texas' use of Special Issues to guide jury discretion in the sentencing phase, notwithstanding the fact—expressly averted to in the plurality opinion for the Court—that mitigating evidence is employed in the Texas scheme *only* to inform the jury's consideration of the answers to the Special Issue questions." *Id.* (emphasis added).

Justice Stevens, joined by Justices Brennan and Marshall, dissented, concluding the defendant's evidence of freedom from disciplinary violations during several years of imprisonment was relevant as mitigation in respects other than simply as it bore on his future dangerousness. Such evidence indicated "that petitioner's character was not without some redeeming features" and that he "may have virtues that can fairly be balanced against society's interest in killing him in retribution for his violent crimes," *id.* at 2335, and, by suggesting that his commission of the offense was "not in keeping with his ... usual qualities or fruits," bore on his "culpability" for the offense as well as on his future dangerousness. *Id.* at 2336. Justice Stevens concluded that absent some special instruction such as the defendant had requested "it is probable that the jury misapprehended the significance it could attach to mitigating evidence that was descriptive of petition-

tional disturbance" and whether defendant's capacity to appreciate the criminality of his conduct or to conform it to the requirements of law was "substantially impaired." The opinion contains no discussion whatever of the possible

relevance of these latter factors to the "family background" claims of petitioner.

**19.** The opinion observes that no harmless error argument was made.

er's character rather than predictive of his future behavior." *Id.* at 2337. This in Justice Stevens' view rendered the sentence invalid under *Lockett* and *Eddings* and related cases.

Justice O'Connor, with whom Justice Blackmun joined, specially concurred. *Id.* at 2332–2335. She considered *Lockett, Eddings* and *Hitchcock* as standing for the proposition that "punishment should be directly related to the personal culpability of" the defendant, and she concluded that "a state may not constitutionally prevent the sentencing body from giving effect to evidence relevant to the defendant's background or character or the circumstances of the offense that mitigates against the death penalty." *Id.* at 2333. In Justice O'Connor's view, the evidence of defendant's good conduct in prison "had no relevance to any other aspect of petitioner's character" than his future dangerousness. *Id.* Hence, no special instruction was required. Justice O'Connor contrasted "[t]he limited probative value" of that particular mitigating evidence to "[e]vidence of voluntary service, kindness to others, or of religious devotion [which] might demonstrate positive character traits that might mitigate against the death penalty." *Id.* Her opinion also states:

> "If, however, petitioner had introduced mitigating evidence about his background or character or the circumstances of the crime that was not relevant to the special verdict questions, or *that had relevance to the defendant's moral culpability beyond the scope of the special verdict questions*, the jury instructions would have provided the jury with no vehicle for expressing its 'reasoned moral response' to that evidence. If this were such a case, then *we would have to decide whether* the jury's inability to give effect to that evidence amounted to an Eighth Amendment violation." *Id.* (emphasis added).

However, Justice O'Connor did not expressly proffer an answer to that question.

*Penry*

At long last, we turn to the crucial decision in *Penry*. There the evidence showed

that the defendant, 22 years old and on parole from a prior rape conviction at the time of the charged offense, "suffered from organic brain damage and moderate retardation, which resulted in poor impulse control and in inability to learn from experience." *Id.* 109 S.Ct. at 2941. The brain damage was likely present from birth, "but may have been caused by beatings and multiple injuries to the brain at an early age." *Id.* Penry's mother had "frequently beaten him over the head with a belt when he was a child," and he was "routinely locked in his room without access to a toilet for long periods of time." He "was unable to learn in school and never finished the first grade." Until age twelve, Penry "was in and out of a number of state schools and hospitals." *Id.* Thereafter, it took him over a year to learn to print his name. *Id.* at 2942. The two psychiatrists testifying for the State both opined that Penry was sane, but they also acknowledged his "extremely limited mental ability, and that he seemed unable to learn from his mistakes," one indicating that Penry had "an inability to learn from experience and a tendency to be impulsive and to violate society's norms." *Id.* Defense counsel unsuccessfully objected to the sentencing charge on several grounds, including its failure to define "deliberately" as used in the first special issue, its failure to "authorize a discretionary grant of mercy based upon the existence of mitigating circumstances," and its failure to condition a death sentence on a determination "that any aggravating circumstances ... outweigh any mitigating circumstances." *Id.* At sentencing, defense counsel argued, among other things,

> "that if a juror believed that Penry, because of the mitigating evidence of his mental retardation and abused background, did not deserve to be put to death, the juror should vote 'no' on one of the special issues even if it believed the State had proved that the answer should be 'yes.' " *Id.* at 2950.

In response, the prosecutor noted that the defense counsel had not argued the special issues or shown how the state had failed to meet its burden of proof on them.

The Court, in an opinion by Justice O'Connor, joined in this respect by Justices Brennan, Marshall, Blackmun and Stevens, set aside the death sentence, concluding:

"In light of the prosecutor's argument, and in the absence of appropriate jury instructions, a reasonable juror could well have believed that there was no vehicle for expressing the view that Penry did not deserve to be sentenced to death based upon his mitigating evidence." *Id.*[20]

Justice O'Connor first determined that the rule Penry sought to establish—that where evidence of the defendant's "mental retardation and abused childhood ... is presented, Texas juries must, upon request, be given jury instructions that make it possible for them to give effect to that mitigating evidence"—was not a " 'new rule' " for purposes of *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), "because it is dictated by *Eddings* and *Lockett." Penry* at 2947. The opinion goes on to explain that *"Eddings* makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence." *Id.* at 2947. Quoting her concurring opinion in *California v. Brown,* 479 U.S. 538, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987), Justice O'Connor states that "defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse" and that a capital sentence " 'should reflect a reasoned

moral response to the defendant's background, character, and crime.' " *Penry* at 2947. Penry's contention is again described as being that the Texas statute was applied in a manner "precluding the jury from acting upon the particular mitigating evidence he introduced." *Id.* Yet again, his claim is characterized as follows:

"Penry argues that his mitigating evidence of mental retardation and childhood abuse has relevance to his moral culpability beyond the scope of the special issues, and that the jury was unable to express its "reasoned moral response" to that evidence in determining whether death was the appropriate punishment. We agree. Thus, we reject the State's contrary argument that the jury was able to consider and give effect to all of Penry's mitigating evidence in answering the special issues without any jury instructions on mitigating evidence." *Id.*

The opinion goes on to explain this conclusion. Respecting the first special issue, the opinion, though suggesting some doubt about the matter, assumes, *arguendo,* that " 'deliberately' " was understood by the jury in this connection to mean "something more than" simply " 'intentionally' " (which had already been established by the guilty verdict). *Id.* at 2948. It concedes that "Penry's mental retardation was relevant ... to whether he was capable of acting 'deliberately.' " *Id.* at 2949. Nevertheless, "[p]ersonal culpability is not solely a function of a defendant's capacity to act 'deliberately.' " A "rational juror" could have concluded "in light of Penry's confession" that he "deliberately killed ... to escape detection."[21] However, "that same juror

---

**20.** Justice Scalia, joined by the Chief Justice and Justices White and Kennedy, dissented from this holding. *Id.* at 2963–68.

Justice O'Connor's opinion also held that the Constitution did not prohibit execution of the mentally retarded, although recognizing that that issue was within the first exception to the doctrine of *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), barring retroactive habeas application of new rules. *Id.* at 2952–2958. All Justices concurred in the *Teague* aspect of this holding; but Justices Brennan, Marshall, Blackmun and Stevens dissented from the substantive holding, *id.* at 2958–2963, while the Chief Justice and Justices White, Scalia and

Kennedy agreed with it (although disagreeing with a portion of Justice O'Connor's reasoning in this respect). *Id.* at 2963–64. This aspect of *Penry* is not implicated in our present consideration of the case *sub judice.*

**21.** The opinion does not detail the content of the confession. However, it is described in the opinion of the Court of Criminal Appeals on direct appeal, *Penry v. State,* 691 S.W.2d 636 (Tex.Crim.App.1985), *cert. denied,* 474 U.S. 1073, 106 S.Ct. 834, 88 L.Ed.2d 805 (1986), as reflecting that Penry "had been planning for months to rape somebody and that in the three weeks prior to the instant offense appellant had fo-

could also have concluded that Penry"—because his "mental retardation" made him "less able than a normal adult to control his impulses or to evaluate the consequences of his conduct," and "because of his history of childhood abuse"—"was less morally 'culpable than defendants who have no such excuse,' but who acted 'deliberately' as that term is commonly understood." *Id.* Thus, in the absence of a sufficiently broad definition of deliberately "we cannot be sure that the jury was able to give effect to the mitigating evidence of Penry's mental retardation and history of abuse in answering the first special issue." *Id.* [22]

As to the second special issue dealing with future dangerousness, Justice O'Connor observes that Penry's mitigation evidence "is relevant *only* as an *aggravating* factor because it suggests a 'yes' answer to the question of future dangerousness." *Id.* at 2949 (initial emphasis added). She continues by stating that the evidence of Penry's "mental retardation and history of abuse," though diminishing his blameworthiness, "indicates that there is a probability that he will be dangerous in the future," and then quotes with approval from Judge Reavley's opinion for this court in that case, including the following:

" 'If anything, the evidence made it more likely, not less likely, that the jury would answer the second question yes. It did

not allow the jury to consider a *major thrust* of Penry's evidence as *mitigating* evidence.' 832 F.2d at 925 (footnote omitted) (emphasis in original)." *Id.* at 2950 (initial emphasis added).

Justice O'Connor then turns briefly to the third special issue, concerning whether the killing "was unreasonable in response to the provocation, if any, by the deceased." Although the opinion recites the evidence supporting the affirmative answer to this issue,[23] it does not expressly say or even suggest that the mitigating evidence had any relevance to the question (nor does it recite that the State asserted any such relevance). *Id.* at 2950.

Justice O'Connor concludes that resentencing is required because "the jury was not provided with a vehicle for expressing its 'reasoned moral response' to" the evidence of Penry's "mental retardation and abused background" in "rendering its sentencing decision." *Id.* at 2952.

■ *Penry* clearly stands for the proposition that merely because the mitigating evidence has *any* relevance to a negative answer to one of the special issues does not necessarily suffice in all cases to sustain application of the Texas statute. Penry's evidence had *some* such relevance to the first issue. The more difficult question is whether the Texas statute can operate as written in any case where the mitigating

cused on the deceased and [another] as possible victims," *id.* at 653, that on the morning of the offense when he decided to go to the victim's house (where he forced his way in) and rape her "I knew that if I went over to the chick's house and raped her that I would have to kill her because she would tell who I was to the police and I didn't want to go back to the pen," *id.* at 641, 652–53, and that while the victim was lying helpless on the floor following the rape "I came back and sat on her stomach. I told her that I was going to kill her and that I hated to but I thought she would squeal on me." *Id.* at 641.

The opinion of Justice Clinton, concurring in the result on the direct appeal, espouses the view that the failure to define "deliberately" was error (the majority held it was not error), but that the error was harmless "due to the fact that the evidence of 'deliberateness' was uncontested, overwhelming and in large part gleaned from appellant's written admissions." *Id.* at 657.

**22.** Judge Reavley, writing for the court in our consideration of *Penry*, observed concerning the deliberateness issue:

"Having just found Penry guilty of an intentional killing, and rejecting his insanity defense, the answer to that [the first] issue was likely to be yes. Although some of Penry's mitigating evidence of mental retardation might come into play in considering deliberateness, a *major thrust* of the evidence of his background and child abuse, logically, does not." *Penry v. Lynaugh*, 832 F.2d 915, 925 (5th Cir.1987) (emphasis added), *rev'd, Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

**23.** "Penry's own confession indicated that he … killed her after her struggle had ended and she was lying helpless." *Id.* at 2950. *See also* n. 21 *supra* (indicating that killing was to avoid detection and was contemplated for this purpose from the beginning).

evidence, though all clearly relevant to support a negative answer to one or more of the issues, nevertheless also has *any* mitigating relevance *whatever beyond* the scope of the special issues. *Penry* can fairly be read as precluding use of the Texas statutory scheme in any such situation. But, *Penry* can *also* fairly be read as addressing only a situation where some major mitigating thrust of the evidence is substantially beyond the scope of any of the issues. That, indeed, was the case in *Penry*, where as to the third issue the mitigating evidence was all essentially irrelevant, as to the second issue it was *only* affirmatively harmful to the defense, and as to the first issue its favorable relevance was essentially minor but its "major thrust" was beyond the scope of the issue (see notes 21 and 22 *supra*).

▮ We conclude that *Penry* does not invalidate the Texas statutory scheme, and that *Jurek* continues to apply, in instances where no major mitigating thrust of the evidence is substantially beyond the scope of all the special issues. That is particularly appropriate in a case such as this, where there is no "major thrust" of any of the mitigating evidence which is not relevant to support a negative answer to the second special issue, the only special issue which *Jurek* addressed. Any other holding, it seems to us, would effectively render *Jurek*, and the Texas statutory scheme which it sustained, dead letters.

It is a commonly accepted truism that, just as *none* of us is *all* good, so also *none* of us—not even those who will probably commit criminal acts of violence constituting a continuing threat to society—is *all* bad. The number of capital crime defendants who have *nothing* in their background which might tend to reflect a positive character trait—who have *never* performed *any* voluntary service or exhibited *any* kindness to others or supported their family, to mention but three possible examples—must be miniscule at most. And this, of course, has been obvious all along. So too has it always been obvious that many defendants—because of some transitory condition such as relative youth or emotion-

al distress incident to one of life's many crises to which all are subject such as divorce or loss of a loved one or a job—may, when they committed an offense, have been less able than those not so afflicted to control themselves and evaluate their conduct and its consequences. If *Penry* is read broadly, then in none of these cases can the Texas statutory scheme pass muster. Every one of these cases—the case where a month previously the defendant broke up with his girl friend or lost his job, the case where as a youth the defendant volunteered to mow a neighbor's yard or was in his early twenties when the offense was committed, and all the others—would demand some other system of sentencing trial. The Texas statutory scheme would be essentially meaningless and *Jurek* would have in substance been overruled.

We doubt that the Supreme Court intended this. Not only has the Court not expressly overruled *Jurek*, but to the contrary it has cited *Jurek* with approval numerous times. As an early example, in *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), the Court noted that *Jurek* upheld the Texas statutory scheme which "mandates a sentence of death" if the three "statutory penalty questions" are answered affirmatively, *id.* 100 S.Ct. at 2524 n. 1, and observed that Texas could properly ensure that its capital case jurors "be willing not only to accept that in certain circumstances death is an acceptable penalty but also to answer the statutory questions without conscious distortion or bias," while nevertheless recognizing that "jurors under the Texas ... procedure unavoidably exercise a range of judgment and discretion while remaining true to their oaths." *Id.* at 2527. *See also Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398 (1980). As we have previously noted, *Lockett* states that the deficiencies of the Ohio statute "can best be understood" by comparing it to, *inter alia*, the "significantly different" Texas statute which *Jurek* upheld. *Lockett*, 98 S.Ct. at 2965, 2966. While the *Eddings* plurality does not cite *Jurek*, many decisions of the Court since then have. We have noted the

prominence given to *Jurek* in *Skipper*, 106 S.Ct. at 1671. Other post-*Eddings* decisions citing *Jurek* with approval include *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 554–55, 98 L.Ed.2d 568 (1988); *Sumner v. Shuman*, 483 U.S. 66, 107 S.Ct. 2716, 2721, 97 L.Ed.2d 56 (1987); *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 1770, 90 L.Ed.2d 137 (1986); *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 876, 879, 79 L.Ed.2d 29 (1984) (declining to "effectively overrule *Jurek*"); *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 3453–54, 77 L.Ed.2d 1171 (1983); *Barefoot v. Estelle*, 463 U.S. 880, 103 S.Ct. 3383, 3396, 77 L.Ed.2d 1090 (1983); and *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 2742 n. 13, 77 L.Ed.2d 235 (1983). The *Franklin* plurality relied principally on *Jurek* and observed that the Texas "method for providing for the consideration of mitigating evidence has been cited repeatedly with favor." *Id.* 108 S.Ct. at 2331 (footnote omitted). Neither the *Franklin* concurrence nor *Penry* purports to jettison *Jurek*. Although *Penry* clearly makes an exception to *Jurek*, it gives no express indication that the exception made is conceived of or recognized as being vastly broader than the rule itself, or that *Jurek* and the Texas scheme will thereafter remain valid only in the very rarest of cases.

Since *Penry*, the Court has continued to cite *Jurek* with approval. Thus, the Chief Justice's opinion in *Blystone v. Pennsylvania*, 494 U.S. 299, 110 S.Ct. 1078, 1081–82, 108 L.Ed.2d 255 (1990), joined in by Justices White, O'Connor, Scalia and Kennedy, describes *Jurek* and the Texas system in a way which obviously would be wholly inappropriate if either were viewed as still valid in no more than a small minority of cases. The same can be said for the opinion of Justice Kennedy, joined in by the Chief Justice and Justices White, O'Connor and Scalia, in *Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 1261–62, 108 L.Ed.2d 415 (1990), the here pertinent language of which is quoted in the margin.[24] Plainly, Justice Kennedy regards *Penry* as the exception to *Jurek*, not *Jurek* the exception to *Penry*.

Moreover, as Justice Kennedy points out in *Saffle* (see note 24, *supra*), a broad reading of *Penry* is inconsistent with *Penry*'s holding that its result was "dictated by" *Lockett* and *Eddings* for purposes of *Teague*.

Similar considerations require rejection of any notion that a broad reading of *Penry* is consistent with *stare decisis* because the Texas courts have not kept the "assurance" of *Jurek*, or the Texas scheme is really different than it appears on its face or had been described by the Texas courts prior to the Supreme Court's decision in *Jurek*. The opinion in *Jurek*—rendered the same day as *Woodson* required "particularized consideration of relevant aspects of the character and record of each convicted defendant"—explicitly recognizes that the Texas jury is only allowed to answer "yes" or "no" to three statutory questions

---

24. Justice Kennedy's opinion states:

"To the extent that Penry's claim was that the Texas system prevented the jury from giving *any* mitigating effect to the evidence of his mental retardation and abuse in childhood, the decision that the claim did not require the creation of a new rule is not surprising. *Lockett* and *Eddings* command that the State must allow the jury to give effect to mitigating evidence in making the sentencing decision; Penry's contention was that Texas barred the jury from so acting....

"Penry's claim, moreover, did not ask us to apply the reasoning of *Lockett* and *Eddings* so much as it required us to apply our decision in *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). *Penry* interpreted *Jurek* as holding that the Texas death penalty statute is constitutional so long as it is interpreted by the Texas courts to permit the jury to consider mitigating circumstances proffered by the defendant.... Having thus construed *Jurek*, we concluded that resolution of Penry's claim that 'those assurances were not fulfilled *in his particular case*,' 492 U.S., at [318], 109 S.Ct., at 2947 (emphasis in original), did not involve the creation of a new rule.... *Penry*, ... must be understood in terms of the Court's ruling in *Jurek*, and its application in later cases. We did not view *Lockett* and *Eddings* as creating a rule different from that relied upon in *Jurek;* rather, we indicated that *Lockett* and *Eddings* reaffirmed the reasoning in *Jurek*...." *Id.* 110 S.Ct. at 1261–62 (initial emphasis added).

Justice Kennedy goes on to cite *Jurek* as an example of "our long-standing recognition that, above all, capital sentencing must be reliable, accurate, and nonarbitrary." *Id.* 110 S.Ct. at 1262.

and that if these are answered "yes" the death penalty is automatic. The exact wording of the questions is reflected in the Court's opinion. The Court holds that the issue is whether these specific "enumerated questions allow consideration of particularized mitigating factors." *Id.* at 2956. The Court gives an affirmative answer *not* on the basis of any assumed special instructions or definitions being given to the jury, but rather *entirely* on what *evidence* the Texas courts have said may be brought before and considered by the jury *in answering* the second (future dangerousness) question. Thus, the Court relies on the Texas court opinion which it describes as interpreting "the second question to allow *a defendant to bring to the jury's* attention whatever mitigating circumstances he may be able to show." *Id.* (emphasis added). The Court next quotes the Texas court's language in which it says "the jury could consider" various items of evidence—including matters such as presence or absence of past criminal conduct, "age of the defendant" and "mental or emotional pressure"—"*[i]n determining the likelihood that the defendant would be a continuing threat to society.*" *Id.* (emphasis added). The Supreme Court then says "[b]y authorizing *the defense to bring before the jury* ... whatever mitigating circumstances relating to the individual defendant can be adduced, Texas has ensured that the sentencing jury will have adequate guidance to enable it to perform its sentencing function." *Id.* at 2958 (emphasis added). This "assurance" has not been broken or even slightly bent, but on the contrary has been fully performed. Texas has continued to interpret its sentencing statute just exactly as the Supreme Court in *Jurek* assumed it would.

◼ The Supreme Court's opinion in *Jurek* reflects that the defendant there was twenty-two years old, had been drinking beer earlier in the day of the offense, and had been steadily employed and contributed to his family's support. *Id.* at 2954. At the very least, *Jurek* must stand for the proposition that these mitigating factors— relative youth and evidence reflecting good character traits such as steady employment

and helping others—are adequately covered by the second special issue. *Penry* cannot hold otherwise and at the same time not be a "new rule" for *Teague* purposes. The decisions in *Eddings* and *Lockett* do not justify a contrary conclusion, as *Saffle* says "[w]e did not view *Lockett* and *Eddings* as creating a rule different from that relied upon in *Jurek;* rather" these cases "reaffirmed the reasoning in *Jurek.*" *Saffle* at 1262.

◼ We believe that what *Penry* represents is a set of atypical circumstances of a kind that, quite understandably, neither the Texas Court of Criminal Appeals nor the Supreme Court in *Jurek* had in mind, namely circumstances where the defense's mitigating evidence would have either no substantial relevance or only adverse relevance to the second special issue. Typically, evidence of good character, or of transitory conditions such as youth or being under some particular emotional burden at the time, will tend to indicate that the crime in question is not truly representative of what the defendant's normal behavior is or may become over time, and that the defendant may be rehabilitable so as not to be a continuing threat to society. The core of *Jurek*—which we cannot conclude has been abandoned—is that the mitigating force of this kind of evidence is adequately accounted for by the second special issue. But in *Penry* the Court was faced for the first time with a wholly different type of mitigating evidence. Not evidence of good character, but of bad character; not evidence of potential for rehabilitation, but of its absence; not evidence of a transitory condition, but of a permanent one; but *nonetheless* evidence which was strongly mitigating because these characteristics were due to the uniquely severe permanent handicaps with which the defendant was burdened through no fault of his own, mental retardation, organic brain damage and an abused childhood. There was no way this type of evidence could be given any mitigating force under the second special issue. To recognize that, as *Penry* did, is not necessarily

to deny the validity of *Jurek* as it applies to the more typical case.

We conclude that the core of *Jurek* remains intact, and we now apply it to the circumstances *sub judice.*

## Youth

■ The primary mitigating factor which Graham urges was not adequately encompassed in the special issues is his youth. We disagree.

For at least five years before Graham's trial, it was established Texas law that the jury, in answering the second special issue, could consider "the age of the defendant." *Jurek v. State,* 522 S.W.2d 934, 940 (Tex. Crim.App.1975), *aff'd sub nom. Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). Since then, the Texas decisions have consistently followed this rule. For example, in *Roney v. State,* 632 S.W.2d 598 (Tex.Crim.App.1982), the Court of Criminal Appeals, noting that the defendant was seventeen and that "the age of the defendant" was "relevant in deciding the second punishment issue," *id.* at 601, held that considering the entire record, including the defendant's "young age," the evidence was insufficient to support the jury's affirmative answer to the second issue. *Id.* at 603. *See also, e.g., Robinson v. State,* 548 S.W.2d 63, 64 (Tex.Crim.App.

1977); *Earvin v. State,* 582 S.W.2d 794, 798–99 (Tex.Crim.App.1979); *Brasfield v. State,* 600 S.W.2d 288, 293 n. 3 (Tex.Crim. App.1980); *Keeton v. State,* 724 S.W.2d 58, 61 (Tex.Crim.App.1987).

The Supreme Court's opinion in *Jurek* affirmatively reflects that the defendant was "22 years old at the time" of the offense, *id.* at 2954, and, in upholding the death sentence and the Texas scheme, quotes the portion of the Court of Criminal Appeals' opinion stating that in answering the second issue the jury can consider " 'the age of the defendant.' " *Id.* at 2957. *Jurek* thus squarely answers the question of whether "youth" is adequately taken into account by the second special issue. If *Penry* compels a different result, it would have been a new rule for purposes of *Teague,* as *Saffle* makes clear. Indeed, if *Jurek* may not apply to the very type of case that was then before the Court, it has been overruled. But, as noted, the Supreme Court has not so treated it. Moreover, *Penry* itself involved a twenty-two-year-old defendant, *id.* at 2941, and the opinion contains no suggestion whatever that this fact was one which could not be adequately taken into account in answering the statutory special issues.[25]

Since *Penry,* the Texas Court of Criminal Appeals has continued to hold that the sec-

**25.** Nor can we accept the notion that twenty-two is not youthful for purposes of any constitutionally mandated rule that the capital sentencer must be able to take into account the defendant's "youth" at the time of the offense. Texas clearly regards those in their early twenties as youthful for this purpose. *See, e.g., Lackey v. State,* 819 S.W.2d 111, 129 (Tex.Crim.App.1991) (describing as a mitigating circumstance "youthful age (23) at the time of the offense"); *Trevino v. State,* 815 S.W.2d 592, 622 (Tex.Crim.App. 1991) ("There is also mitigating evidence of appellant's youth; appellant was twenty-one years old at the time of the offense"); *Madden v. State,* 799 S.W.2d 683, 684 (Tex.Crim.App.1990) ("Appellant, however, introduced substantial mitigating evidence. He was only twenty-one years old at the time of this offense"). The salient factors which make "youth" mitigating—principally inexperience with resultant diminished judgment and self-control—are all generally present among those in their early twenties, albeit to a lesser degree than in those still younger. And this, indeed, is the approach taken by Graham's counsel, as reflected in his

statements in closing argument (see note 28 *infra; see also* text at note 9 call *supra*). We do not believe that for this purpose a categorical distinction is proper based on some specific age, such as eighteen, which is often the age of majority (in Texas minors are those under eighteen who have never been married; Tex. Probate Code § 3(t)) or the minimum age for purposes of engaging in certain conduct (cf. U.S. Const.Am. XXVI). The Supreme Court rejected such an approach in holding that the Constitution does not forbid the death sentence for offenses committed at age sixteen or seventeen. *Stanford v. Kentucky,* 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). Moreover, such an approach would be at war with the concept of individualized capital sentencing which underlies *Penry.* It is common knowledge that individuals develop and mature at different rates, and it will frequently be the case, for example, that one eighteen and, say, two months, is actually less "mature" and more "youthful" than another who is seventeen and eight months.

ond special issue provides an adequate vehicle for the jury to take into account the defendant's youth. *See Ex parte McGee*, 817 S.W.2d 77, 80 (Tex.Crim.App.1991); *Lackey v. State*, 819 S.W.2d 111 (Tex.Crim.App.1991); *Trevino v. State*, 815 S.W.2d 592, 622 (Tex.Crim.App.1991). We, too, appear to have recognized this. *See DeLuna v. Lynaugh*, 890 F.2d 720, 722 (5th Cir.1989) (evidence that defendant was twenty-one when offense committed would not bring him within *Penry*).

As the panel majority and dissent each correctly recognized, youth is mitigating because insufficient experience has not allowed judgment and self-control to fully develop, but the limitations attributable to youth are all necessarily transitory. *Graham*, at 898, 899. Therefore, whatever is mitigating about youth tends to lend support to a "no" answer to the second special issue, and its tendency to do so is essentially proportional to the degree to which the jury concludes such factors were influential in the defendant's criminal conduct. The greater the role such attributes of youth are found to have played in the defendant's criminal conduct, the stronger the inference that, as his youth passes, he will no longer be a danger to society. Thus, the second special issue affords an adequate vehicle by which the jury can give effect to the mitigating aspect of youth.

█ We reject the contention that the second special issue is inadequate for this purpose because the jury may believe that youth mitigated the defendant's culpability though not his future dangerousness. But youth is not mitigating with respect to conduct not attributable to it. Thus, *Penry* says that evidence of a defendant's background and character is relevant because " 'defendants who commit criminal acts that are *attributable to* a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.' " *Id.* at 2947 (quoting Justice O'Connor's concurrence in *California v. Brown*, 479 U.S. 538, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987)) (emphasis added). *See also Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 1199, 108 L.Ed.2d 316 (1990) (same).[26] To the extent that Graham's criminal conduct was a product of his youth he was for that reason not only less culpable but, to the same extent, also less likely to be dangerous when no longer young. To the extent Graham's criminal conduct was not attributable to his youth, his youth neither reduced his culpability nor his future dangerousness. Nothing in the present record suggests that the jury here might have viewed the matter in any other light.[27]

Finally, the evidence here, and the manner in which the case was approached and tried in this respect, do not suggest any special factor or circumstance militating against application of what we conceive to be the appropriate general rule, namely that the mitigating force of the defendant's youth at the time of the offense may be adequately taken into account in answering the second special issue. In marked contrast to *Penry*, there is here nothing to suggest that defense counsel desired to have the mitigating force of youth presented or considered in any other manner than as a basis for a negative answer to the

---

26. It is true that a hypothetical juror might conclude that death is always an inappropriate penalty for capital murder committed by a seventeen year old simply because the offender was seventeen, and regardless of whether the offense was to any extent attributable to his youth. However, such a conclusion is not based on individualized consideration of the offender but merely on a characteristic which is *precisely* the same for him as for every other human being who attains that age, and as such amounts to no more than disagreement with the Texas law which allows execution of seventeen year olds for capital murder.

27. Moreover, to say that the second special issue is for this reason inadequate to take youth into account, is necessarily to also say that it is inadequate to take into account any other mitigating factor which is not wholly coterminous and synonymous with future dangerousness. Yet, as previously indicated, that would be contrary to the core holding of *Jurek,* and would in effect render *Jurek* and the Texas statute it upheld a dead letter. We do not read *Penry* as going that far.

second special issue.[28]  *Cf. Lowenfield,* 108 S.Ct. at 552 (even where absence of objection is not a waiver it may reflect posture and understanding of trial participants).

We reject Graham's contention that, in light of *Penry,* the mitigating force of his youth could not adequately be given effect in answering the special issues.

*Other circumstances*

■ Although the mitigating factor primarily at issue is youth, Graham also contends that under *Penry* the testimony of his stepfather, Samby, and his grandmother, Chron, constituted mitigating evidence which could not adequately be given effect in answering the special issues.  We disagree.

With one exception to be noted, the testimony of Samby and Chron simply constituted rather mild evidence of normal, good—though not exceptionally good—character on Graham's part: he had respect for and was nice to his mother and stepfather, cared about and was close to his mother, gave his grandmother no problems or trouble, was never violent, never had weapons, would willingly help out around the house, went to school and to church, "loved the Lord," worked and contributed to the support of his two children.

It appears to us that the principal mitigating thrust of all this evidence is to suggest that the events of May 13–20 were aberrational and atypical of Graham's true character and that he thus had potential for rehabilitation, and would not be a continuing threat to society.  As such, the mitigating force of this evidence can adequately be given effect under the second special issue.

This evidence does not seem different in kind from that before the Supreme Court in *Jurek,* where the defendant's father testified that "the petitioner had always been steadily employed since he had left school and that he contributed to his family's sup-

**28.** Counsel in essence argued that Graham's youth explained his May 13 to 20 crime spree and that he would grow out of it: "A young man, hasn't even reached 20 years old.  He goes on a rage for 7 days, 7 days out of his life.  He is not going to ever forget....  Gary Graham, 17 years old, went on a rage for 7 days," and:
"... what you are called upon to do is predict whether some time in the future Gary Graham could become a person fit to return to society.  At least he is alive.  See, when you are 17 or 20, you are young, hot-to-trot.  You are going to set the world on fire one way or the other, right or wrong.  When people come in their middle 20's and middle 30's, a change a little bit from your more radical stands to a more somewhat upright posture because you have had not only time to think, but to see what is in the world.  Most of the crime is committed by young people.  By the time you get to 25 or 35, it's different.  35 and above....  because there is something about human nature that not only changes you, but slows you down as you live.  If you live.  If you live...."
The only dissatisfaction counsel expressed with the charge or special issues was by pre-trial motion asserting that the special issues left too much standardless discretion to the jury.  See note 11, *supra.*
Nothing in the evidence indicates any basis for believing that the offense charged was any more (or less) a product of Graham's youth than any of his other criminal conduct shown by the evidence, and neither side ever suggested otherwise either at trial or in this court.

We reject Graham's contention in this court that his case is like *Penry* because here the prosecutor's argument (especially in respect to "direction" and "seeds of our past") amounted to an implied assertion that Graham's *youth* itself favored an affirmative answer to the second special issue.  We disagree.  The clearly most reasonable understanding of this unobjected to argument is that it is no more than the mere assertion that Graham's criminal conduct was the most reliable predictor of the direction his future would take.  There is absolutely nothing in the argument which implies that this is any *more* likely so because the events of May 13–20, 1981 occurred while Graham was seventeen as opposed to, say, thirty-five (nor even that this was *as* likely so as it would have been if Graham had been thirty-five in May 1981).  The prosecutor was not required to concede that just because of Graham's youth he would not in the future be a danger to society.  And, there is nothing inconsistent in the assertions that, on the one hand, some youthful criminals may pose a danger to society even after they mature, and, on the other hand, that criminal acts by youths are *less* likely to be predictive of future such behavior on their part as a mature adult than are similar acts by those who are already mature adults.  Moreover, we are aware of nothing to suggest that Texas has ever treated youth in this connection as anything other than a factor tending to favor (albeit not necessarily to require) a "no" answer to the second special issue.

port." *Id.* at 2954. Nor does this sort of character evidence seem other than wholly typical of what might be expected in a vast number of cases. As noted, were evidence of this kind held to invoke *Penry,* then *Jurek* and the Texas statutory scheme would for all practical purposes be wholly eviscerated.[29] Further, this sort of evidence is different in kind from that involved in *Penry,* as its relevance to each of the special issues, and particularly the second, is entirely in the direction of a negative answer, and it has no tendency to reduce culpability for the particular crime charged in any way not encompassed within one or more of the special issues. Unlike *Penry* type disability evidence, which can reduce culpability where it is inferred that the crime is attributable to the disability while other similar offenders have no such "excuse," good character evidence provides no variety of "excuse." Further, absent some unusual indication of an essentially *permanent* adverse *change* in character (e.g., brain damage), to the extent that the testimony is convincing that the defendant's general character is indeed good it will also, to essentially the same extent, be convincing that he will not continue to be a threat to society.

■ There remains only to consider the brief portion of the testimony of Chron that Graham's mother was frequently hospitalized, commencing when he was approximately three, with what Chron characterized without elaboration as a "nervous con-

dition" or "mental illness." In an appropriate context, evidence of this general kind might well form part of a proper *Penry* presentation. We conclude that it does not do so in this case, however. There was no evidence of *any* effect this had on Graham, or of any reaction on his part to it, and no attempt was made to even explore that subject. Further, the entire context in which this testimony was presented, from the point of view both of Chron's testimony as a whole and of all the defense evidence at the sentencing hearing, suggests that there was no adverse effect on Graham. There was no suggestion that he was unhappy, withdrawn, moody, difficult to control or the like, or that he had any mental or psychological problems. The entire thrust of the defense evidence, both from Samby and Chron, was the exact opposite, namely that Graham was a good, stable, nonviolent, ordinary youth. There is no substantial evidence that Graham's criminal conduct was "attributable to a disadvantaged background, or to emotional and mental problems," as Justice O'Connor used those terms in *Penry. Id.* at 2947. *See also Boyde,* 110 S.Ct. at 1199. In this respect, the evidence as a whole is simply not comparable to that in *Penry* or *Eddings.*

■ In sum, not only Graham's youth but also his other mitigating evidence could adequately be taken into account in answering the special issues, particularly the second.[30]

---

**29.** We observe that since *Penry,* the Texas courts have held that this kind of evidence is not *Penry* evidence and does not mandate departure from the *Jurek* format. *See, e.g., Ex parte Baldree,* 810 S.W.2d 213, 216–17 (Tex.Crim.App.1991) (evidence that defendant "has been caring, kind, and nonviolent to others … is … reflective of his character and bears upon his propensity, or lack thereof, for committing future violent acts" and thus is adequately covered by the second special issue without further jury instructions); *Richardson v. State,* 1991 WL 99949 (Tex.Crim. App. June 12, 1991, No. 68934) ("evidence of appellant's religious devotion is *Franklin* evidence and could be properly addressed by a jury answering issue number two"); *Mooney v. State,* 817 S.W.2d 693 (Tex.Crim.App.1991) (same). *See also Trevino v. State,* 815 S.W.2d 592, 622 (Tex.Crim.App.1991). In *Boyd v. State,* 811

S.W.2d 105, 111–112 (Tex.Crim.App.1991), the court considered evidence that appellant "was a good worker and was promoted," "was always polite, nice and helpful," "always behaved in a respectful manner," and helped his sister "with her asthma" and his mother "when she hurt her ankle." *Id.* at 111. In rejecting a *Penry* claim, the court said that this evidence "was given full effect within the second special issue" and "[t]o hold otherwise would be tantamount to declaring the capital sentencing scheme facially unconstitutional." *Id.* at 112 (footnote omitted).

**30.** We have focused throughout on the second special issue because it is with respect to it that Graham's evidence had the most apparent and strongest mitigating relevance, and because that is the issue addressed in *Jurek.* We do not imply, however, that Graham's evidence lacked mitigating relevance to the first (or even to the

## Conclusion

As directed by the Supreme Court, we have further considered our previous affirmance of the district court's denial of habeas relief in light of *Penry*. We conclude that our prior disposition is consistent with *Penry*, and remain convinced that it was proper. Accordingly, we reinstate our prior mandate affirming the district court's dismissal of Graham's habeas petition.

AFFIRMED.

REAVLEY, Circuit Judge, with whom POLITZ, KING, DAVIS, and WIENER, Circuit Judges, join, dissenting:

The Supreme Court directed this court to reconsider Graham's petition in the light of *Penry*, not to modify *Penry* or to shape *Penry* for a comfortable fit with *Jurek*. In *Penry*, Justice O'Connor wrote for the Court that the jury must be able to fully consider and give effect to all "evidence that mitigates against the death penalty" and is relevant to a defendant's background, character, or the circumstances of the crime. 109 S.Ct. at 2947, 2951. If youth is an important mitigating factor—and the Court has said that it is [1]—then *Penry* requires that the sentencing jury be allowed to decide that the death penalty is an inappropriate penalty for Gary Graham. That decision could not have been given effect in his case, and the writ should be granted.

The panel majority stated the *Penry* rule as follows: "a jury sentencing a capital defendant who provides evidence about his character, his background, or the circumstances of the offense that is relevant to personal culpability beyond the scope of the statutory questions must receive instructions that allow the jury to give effect to such evidence." 896 F.2d at 896. The en banc majority, after 21 months, pro-

duces an exclusion to the *Penry* rule and holds that no instruction or jury decision is needed for transitory circumstances of mitigation. This court says that any circumstance relevant to whether the defendant is rehabilitable may be adequately treated by the answer to the second issue. Contrary to what the Supreme Court wrote, the Fifth Circuit explains *Penry* as an atypical case where the mitigating evidence either had no substantial relevance, or no adverse relevance, to the second special issue of future dangerousness. I believe my colleagues have gone beyond and contrary to the directions of the Supreme Court and have usurped the role of our superiors.

Graham was 17 years old, legally a minor, when he committed the crime. It is beyond dispute that this fact was a mitigating circumstance, material to the "moral culpability" of the defendant. The jury's sentencing role is to consider such factors and determine whether the defendant is indeed personally and morally culpable. But "culpability" at the punishment phase is not simply a question of guilt or "blameworthiness," but rather a question of "deathworthiness." *See Lackey v. State*, 819 S.W.2d 111, 129 (Tex.Crim.App.1991) (en banc). To say that evidence mitigates a defendant's culpability is not to say that he is any less guilty or deserving of blame, but that he is less deserving of death. *See Penry*, 109 S.Ct. at 2950 (a juror could believe that "Penry lacked the moral culpability to be sentenced to death").

The special issues of the Texas statute demonstrate how evidence can be relevant to a defendant's culpability. The guilty defendant may be less deserving of death because the evidence shows that he did not act deliberately, or that he does not pose a continuing threat to society, or that his conduct was not unreasonable in response to provocation by the deceased. Indeed,

third) special issue; it does have such relevance, and that relevance strengthens our conclusion that the special issues were adequate in this case; but whether such relevance to issues other than the second would alone suffice to take this case out of *Penry*'s scope is another matter.

**1.** See panel opinion; 896 F.2d at 897–98. In *Eddings v. Oklahoma* the Supreme Court said:

"All this does not suggest an absence of responsibility for the crime of murder, deliberately committed in this case. Rather, it is to say that just as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must background and emotional development be duly considered in sentencing." 102 S.Ct. at 877.

much evidence is mitigating only because it is relevant to one or more of these issues. *See Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 2333, 101 L.Ed.2d 155 (1988) (O'Connor, J., concurring) (evidence of the defendant's good conduct in prison had no relevance to his character outside of the special issues). But the message of *Penry* is that some evidence may make the defendant less deserving of death for reasons "beyond the scope of the special issues." *Penry,* 109 S.Ct. at 2948. The evidence of Penry's mental retardation and history of abuse may not have made his crime less deliberate or his continuing threat to society less probable, but it may nevertheless have made him less deserving of death because it may have made him "less able than a normal adult to control his impulses or to evaluate the consequences of his conduct." *Id.* at 2949. Presented with the special verdict questions, and "in the absence of appropriate jury instructions, a reasonable juror could well have believed that there was no vehicle for expressing the view that Penry did not deserve to be sentenced to death based upon his mitigating evidence." *Id.* at 2950.

This case presents the same dilemma. The jury found that Graham's youth did not make his crime less deliberate or his future threat to society less probable. But a reasonable juror could also have determined, if given the opportunity, that Graham did not deserve a death sentence because, at the age of 17, he was less able to control his impulses or evaluate the consequences of his conduct, or because of other relevant reasons. The majority seems to overlook the fact that "there is no constitutional infirmity in a procedure that allows a jury to recommend mercy based on the mitigating evidence introduced by a defendant." *Id.* at 2951. In this case, as in *Penry,* "in the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of [Graham's youth] by declining to impose the death penalty, ... the jury was not provided with a vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision." *Id.* at 2952. Under *Penry,* the jury should

have been allowed to weigh that factor in deciding whether Graham deserved to be sentenced to death.

The majority of this en banc court insists upon crafting its own exclusion and following *Penry* only where there is a "major mitigating thrust of the evidence ... substantially beyond the scope of all the special issues." It even declares that youth is mitigating only with respect to conduct attributable to age, and that the mitigating factor of youth at the time of the offense may be adequately taken into account by a Texas jury in answering the issue of future dangerousness. But the Supreme Court requires the sentencer, before assessing the death penalty, to consider all mitigating evidence, not only mitigating factors that contributed to particular criminal conduct. And the Court does not weigh the "thrust" of the mitigating evidence as between special issues and the decision to sentence to death.

Youth, like mental retardation or crippling circumstances in the defendant's background, may be related to deliberateness or to future dangerousness, but those facts of a defendant's life may also affect an entirely different "thrust" and decision. They may reach the much broader ultimate question: Is death the appropriate response to this human being, considering his moral culpability as a person? Graham's jury was not told that it could consider evidence in this light or that it could give mitigating effect to it in imposing sentence.

The majority opinion is heavy with scholarship and fine legal argument. It undoubtedly alleviates problems in reviewing the cases of Texas prisoners on death row. I fully appreciate the problems. The Texas Court of Criminal Appeals is struggling with them too. *See Black v. State,* 816 S.W.2d 350 (Tex.Crim.App.1991); *Ex parte Harvey Earvin,* 816 S.W.2d 379 (Tex.Crim. App.1991); *Lackey v. State,* 819 S.W.2d 111 (Tex.Crim.App.1991). This does not justify the failure to follow the dictate of the Supreme Court. I would follow that dictate unless the Court, which alone has the authority, chooses to modify our instructions.

PATRICK E. HIGGINBOTHAM, Circuit Judge, dissenting:

The ultimate question in this case is whether the mitigating value of Graham's youth and family circumstances—age seventeen at the time of the offense—is fully expressed by the jury in its answer to two questions: did Graham act deliberately and does Graham present a future danger. The majority opinion, after first concluding that any deficiency in the two questions must be substantial, holds that the answer is yes. I am unpersuaded that the jury's assessment of Graham's moral culpability is fully, or substantially as the majority has it, exhausted by concluding that he acted deliberately and presents a future danger. A jury's reasoned response could be that although Graham acted deliberately, and is likely to do so again, when Graham's tender years and family circumstances are entered in the account of moral culpability, a death sentence is not warranted.

It was true before *Penry* that "[t]he state may not by statute preclude the sentencer from considering *any* ... relevant mitigating evidence." [1] That did not necessarily mean, however, that the state could not limit the effects of mitigation. There was a powerful argument that, given *Jurek*, the Eighth Amendment allowed the state to limit the effects a sentencer might give to mitigating evidence. Justice Scalia made the argument in *Penry*, but his was the dissenting view.

I intend no criticism of the majority's able struggle, but I am not persuaded that we have the freedom to define again the jury's sentencing role in Texas. I say "again" because two decisions of the Supreme Court control this case. The first is that the state, without fettering effect, must give the jury the means for expressing its reasoned moral response.[2] The second decides that Graham's youth and family circumstances are relevant to the core

decision for the jury—his moral culpability.[3]

The state may insist upon the jury's "reasoned" moral decision, but the contribution of Graham's youth to his moral culpability, beyond the issues of deliberateness and future dangerousness, has no intrinsic measure or objective weight. There is a point at which we must accept that the moral culpability of a particular person for a particular crime is what the jury says that it is. With all deference, this quintessential blackbox decision yields to no logical or explainable divison whether youth has some residual "mitigating force after the Texas questions have been answered." It is not a "legal" question at all, but is rather like asking judges not to reason but to look to the sky, presumably, and react. Such discrete Rorschach-like inquiries do not produce or draw upon normative rules. That we are asked to perform such tasks is a powerful signal that something is wrong. The wrong is not difficult to locate. As Justice Harlan put it in *McGautha:*

> Those who have come to grips with the hard task of actually attempting to draft means of channeling capital sentencing discretion have confirmed the lesson taught by the history recounted above. To identify before the fact those characteristics of criminal homicides and their perpetrators which call for the death penalty and to express these characteristics in language which can fairly be understood and applied by the sentencing authority, *appear to be tasks which are beyond present human ability* (emphasis supplied).[4]

*Furman* repudiated *McGautha,* but Justice Harlan's wisdom is validated with each encounter of dead ends in the resulting conceptual puzzle. And a puzzle it is.

For example, the Supreme Court in *Ca-*

1. *Eddings v. Oklahoma,* 455 U.S. 104, 113–115, 102 S.Ct. 869, 876–877, 71 L.Ed.2d 1 (1982).

2. *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

3. *Stanford v. Kentucky,* 492 U.S. 361, 109 S.Ct. 2969, 2978, 106 L.Ed.2d 306 (1989); *see also*

*Thompson v. Oklahoma,* 487 U.S. 815, 108 S.Ct. 2687, 2698, 101 L.Ed.2d 702 (1988).

4. *McGautha v. California,* 402 U.S. 183, 204, 91 S.Ct. 1454, 1466, 28 L.Ed.2d 711 (1971).

*bana v. Bullock*[5] upheld the death sentence while observing that "the jury may well have sentenced Bullock to death despite concluding that he had neither killed nor intended to kill."[6] This despite the fact that in *Enmund v. Florida*[7] the court held that the Eighth Amendment forbids the death penalty for "one ... who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing takes place, or that lethal force will be employed."[8] I would have supposed that whether an accused intended to kill lies at the heart of moral culpability; that the finding of intent to kill would be left with the sentencer. Stated another way, if a state's procedures must allow a defendant's mitigating evidence to find expression in its verdict it is puzzling to allow a state appellate court to supply the critical finding of intent to kill, a finding missing from the jury's verdict. It is a long road from *McGautha* to *Penry,* but the resulting jurisprudence is perverse in that it insists on a reasoned moral response of the jury, an assignment we jurists have failed.

The solution must be left to the Supreme Court, at least in cases as this one where we are left no meaningful latitude. In any event, this case is already so postmarked by the predictable scattering of judges required to react, not reason.

---

**5.** 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986).

**6.** 474 U.S. at 384, 106 S.Ct. at 696.

**7.** 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).

**8.** 458 U.S. at 797, 102 S.Ct. at 3376.