**Johnny Paul PENRY, Petitioner–Appellant,**

v.

**Gary L. JOHNSON, Director, Texas Department of Criminal Justice, Institutional Division, Respondent–Appellee.**

No. 99–20868.

United States Court of Appeals, Fifth Circuit.

June 20, 2000.

---

Wharton & Garrison, New York City, for Penry.

Douglas A. Danzeiser (argued), Austin, TX, for Respondent–Appellee.

Malcolm Nathan Greenstein, Greenstein & Kolker, Austin, TX, Edward Fitzgerald, Rupert Skilbeck, London, WC, for Bar Human Rights Committee of England and Wales Amicus Capital Legal Assistance, Amici Curiae.

Stephen Andrew Yelenosky, Advocacy, Inc., Austin, TX, Patricia G. Williams, Glendale, CA, for American Ass'n on Mental Retardation, Advocacy, Inc., The ARC of the United States, ARC–California, The ARC of Texas, The British Institute of Learning Disabilities, The Intern. Ass'n for the Scientific Study of Intellectual Disabilities, The Joseph P. Kennedy, Jr. Foundation and TASH, Amici Curiae.

Before DAVIS, EMILIO M. GARZA and DENNIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Penry filed a motion for a certificate of appealability (COA) in this § 2254 capital habeas proceeding alleging various constitutional violations. For the reasons that follow, we deny his motion.

I

Penry was convicted of capital murder and sentenced to death in Texas state court for the rape and murder of Pamela Carpenter. Penry raped Carpenter and stabbed her with a pair of scissors. He had met her several weeks earlier while helping to install appliances in her home. Penry matched the description Carpenter gave of her attacker before she died. After being given his Miranda warnings, Penry gave an oral confession and later a signed confession to the rape and murder. At trial, Penry offered mitigating evidence that he was mentally retarded and abused

John E. Wright, Huntsville, TX, Robert S. Smith (argued), Paul, Weiss, Rifkind,

as a child. He was convicted and sentenced to death. The United States Supreme Court granted federal habeas relief and vacated his sentence, holding that Penry's rights were violated by jury instructions the trial court gave at the punishment phase of his trial.[1] The court found that none of the three special statutory questions provided to the jury, under Texas law, allowed the jury to give effect to Penry's mitigating evidence. "The jury was never instructed that it could consider the evidence offered by Penry as mitigating evidence and that it could give mitigating effect to that evidence."[2]

In the second trial, the trial court followed the Texas statutory scheme and gave the jury the same three special questions it had given the jury in the first trial. However, the judge also provided supplemental instructions directing the jury to consider any other relevant mitigating evidence and explained how to give effect to that evidence. Penry was again convicted of capital murder and sentenced to death. The sentence was again affirmed on direct appeal[3] and state habeas relief was denied. The district court also denied Penry's application for a COA. Penry now seeks a COA from this court. We granted Penry's motion for a stay of execution in order to consider his motion for a COA.

## II

■ A COA may only issue if the petitioner makes a "substantial showing of the denial of a constitutional right."[4] This burden can be met if the issues presented "are debatable among jurists of reason; . . . a court could resolve the issues in a different manner; or . . . the questions are adequate to deserve encouragement to proceed further."[5]

■ A death sentence alone does not justify the automatic issuance of a COA, although it is a proper consideration.[6] Any doubts as to whether the COA should issue are to be resolved in the petitioner's favor.[7]

■ Penry's petition was filed after the enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA). Thus, for questions of law or mixed questions of law and fact adjudicated on the merits in state court, we may grant federal habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]."[8] A state court decision is "contrary to" Supreme Court precedent if: (1) the state court's conclusion is "opposite to that reached by [the Supreme Court] on a question of law" or (2) the "state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at an opposite result.[9] A state court unreasonably applies Supreme Court precedent if: (1) it unreasonably applies the correct legal rule to the facts of a particular case or

1. *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (*"Penry I "*).

2. *Penry I,* 492 U.S. at 320, 109 S.Ct. at 2947.

3. *Penry v. State,* 903 S.W.2d 715 (Tex.Crim. App.1995).

4. 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel,* —— U.S. ——, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000); *United States v. Kimler,* 150 F.3d 429, 431 (5th Cir.1998).

5. *Miller v. Johnson,* 200 F.3d 274, 280 (5th Cir.2000) (quoting *Barefoot v. Estelle,* 463 U.S. 880, 893 n. 4, 103 S.Ct. 3383, 3394 n. 4, 77 L.Ed.2d 1090 (1983)); *Hicks v. Johnson,*

186 F.3d 634, 636 (5th Cir.1999), cert. denied —— U.S. ——, 120 S.Ct. 976, 145 L.Ed.2d 844 (2000); *see also Slack,* 120 S.Ct. at 1603–04 (*quoting Barefoot v. Estelle,* 463 U.S. 880, 893 and n. 4, 103 S.Ct. 3383, 77 L.Ed.2d 1090).

6. *Lamb v. Johnson,* 179 F.3d 352, 356 (5th Cir.1999), cert. denied —— U.S. ——, 120 S.Ct. 522, 145 L.Ed.2d 401 (1999).

7. *Id.*·

8. *See Miller,* 200 F.3d at 280–81.

9. *Williams v. Taylor,* —— U.S. ——, 120 S.Ct. 1495, 146 L.Ed. 2d 389 (2000)

(2) it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply."[10] In deciding whether a state court's application was unreasonable, this court considers whether the application was "objectively unreasonable."[11] We now turn to Penry's specific arguments on appeal.

### III

■ Penry first argues that the jury instructions given during the punishment phase of his trial did not allow the jury to consider and give effect to mitigating evidence regarding his alleged mental retardation and severe child abuse; thus, the instructions violated the Supreme Court's directive in *Penry v. Lynaugh*[12] ("*Penry I*"). Penry explains that jurors could only give effect to his mitigating evidence, as the Supreme Court required in *Penry I*, and grant him a life sentence if they found that the evidence fit under one of the three special questions required by Texas law.[13] In *Penry I*, Penry's federal habeas challenge to his first trial and conviction, the Supreme Court found that, under the trial court's instruction, none of the three special statutory questions allowed the jury to give effect to Penry's mitigating evidence. At Penry's retrial, however, the trial court supplemented the instruction it gave in *Penry I*. The court instructed the jury to consider any mitigating circumstances supported by the evidence. The instruction stated, in part:

> [W]hen you deliberate on the questions posed in the special issues, you are

to consider mitigating circumstances, if any, supported by the evidence.... A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character and record or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find ... any mitigating circumstances ... you must decide how much weight they deserve, if any, and ... give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, a negative finding should be given to one of the special issues.

Penry correctly contends that the instruction still required the jury to give a negative answer to one of the three special issues in order for Penry to receive a life sentence. Penry argues that because childhood abuse and mental retardation do not necessarily fit within the scope of any of the special issues, this instruction did not allow the jury to give effect to these mitigating circumstances. However, on direct appeal, the Texas Court of Criminal Appeals found that the instruction satisfied the requirements of *Penry I* and allowed the jury to give effect to those mitigating circumstances.[14]

We agree with the district court that the Texas Court of Criminal Appeals's holding

---

10. *Id.*

11. *Id.*

12. 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

13. The three questions were: 1. Was the conduct of the defendant that caused the death of the deceased committed deliberately and with the reasonable expectation that the death of the deceased or another would result? 2. Is there a probability that the defendant would

commit criminal acts of violence that would constitute a continuing threat to society? 3. Was the conduct of the defendant in killing the deceased unreasonable in response to the provocation, if any, by the deceased? Since *Penry*, the statute has been revised to add a fourth question concerning mitigation.

14. *Penry v. State*, 903 S.W.2d 715, 765 (Tex. Crim.App.1995).

that the challenged instruction was constitutional was not an unreasonable application of clearly established law, namely *Penry I*. The instruction directed the jury to consider and give effect to any mitigating circumstances supported by the evidence by answering "no" to one of the special issues if they felt a life sentence was appropriate. This instruction satisfied the deficiency in the trial court's instruction identified in *Penry I*: "[t]he jury was never instructed that it could consider the evidence offered by Penry as mitigating evidence and that it could give mitigating effect to that evidence in imposing sentence." [15]

We are not writing on a clean slate on this issue. This Court approved identical jury instructions on this point in *Miller* [16] and *Emery v. Johnson*. [17] In *Miller*, we concluded that the defendant failed to show that the same instructions given by the trial court in this case violated *Penry I*. We rejected the argument that the jury was prevented from considering the mitigating evidence. [18]

> Miller's jury, unlike Penry's, ·was instructed that it should consider mitigating evidence when deliberating on the special issues....[It] was instructed that if it determined when giving effect to the mitigating evidence, if any, that a life sentence rather than a death sentence was an appropriate response to Miller's personal culpability, a negative finding should be given to the special issue under consideration. [19]

In the alternative, Penry argues that the jury charge was a "nullification instruction" and was therefore unconstitutional insofar as it instructed jurors to violate

their oaths by rendering an untruthful answer to one of the special issues if they wished to give effect to the mitigating evidence presented in this case. We disagree. The jury was not told to disregard the law; rather, it was instructed on how to obey the law, as explained by the Supreme Court in *Penry I*.

### IV

Next, Penry argues that the admission of certain psychiatric testimony and evidence offered by the state at trial violated his Fifth and Sixth Amendment rights.

### A.

Penry's Fifth Amendment challenge involves three categories of psychiatric testimony and evidence presented by the state: 1. the testimony of Dr. Fason admitted during the guilt/innocence phase of trial; 2. the testimony of Dr. Quijano admitted during the punishment phase of trial; and 3. the report of Dr. Peebles describing a court-ordered examination of Penry, which was admitted at the punishment phase of trial.

### 1.

Penry's primary challenge is to the testimony of Dr. Fason. Penry contends that Fason's testimony was based on his court-ordered competency examination of Penry, and that the state's use of the testimony to argue future dangerousness during the punishment phase violated Penry's rights under *Estelle v. Smith*. [20] More particularly, Penry argues that his Fifth Amendment privilege against compelled self-incrimination was violated because he

---

15. *Penry I*, 492 U.S. at 320, 109 S.Ct. at 2947.

16. 200 F.3d 274.

17. 139 F.3d 191 (5th Cir.1997), cert. denied 525 U.S. 969, 119 S.Ct. 418, 142 L.Ed.2d 339 (1998).

18. 200 F.3d at 290.

19. *Miller*, 200 F.3d at 290.

20. 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). *Estelle* held that the defendant's Fifth Amendment right against compelled self-incrimination was violated because he was not told that any statements made during his competency exam could be used against him at the punishment phase on the issue of future dangerousness.

was not advised before Dr. Fason's examination of his right to remain silent and that his statements could be used against him at the sentencing proceeding.

On direct appeal, the Texas Court of Criminal Appeals found that Dr. Fason's testimony fell within the *Buchanan v. Kentucky*[21] exception to *Estelle.* Under *Buchanan*, if a defendant presents psychiatric evidence, then the prosecution may present rebuttal psychiatric evidence without violating the Fifth Amendment.

Penry contends that, as applied to this case, proper rebuttal evidence under *Buchanan* is limited to evidence tending to prove that Penry is not mentally retarded and that the state's evidence went beyond that scope. After a careful review of the record, we find that Fason's testimony did fall within the *Buchanan* exception.

At the guilt/innocence phase of trial, Penry offered various psychological records, including reports of his performance on a number of psychological and IQ tests. The records also included observations of his emotional status and social behavior. As demonstrated by the closing argument of Penry's attorney, one reason these records were introduced was to lay a predicate for an argument that Penry's confessions were not truly voluntary because Penry is mentally retarded and, thus, submissive to authority figures. The evidence was also offered to support Penry's argument that his mental retardation made him less likely to act with the intent required for capital murder.

Dr. Fason's testimony was introduced to rebut these arguments. Fason testified that Penry had an antisocial personality disorder. He explained how that condition could affect Penry's IQ scores, and that it was possible that Penry was not mentally retarded. Also, he testified that someone with an antisocial personality disorder would usually not be easily led by others and would likely disrespect and rebel against authority. Fason did not discuss any statements made by Penry during Fason's examination, except whether Penry was able to identify his attorney at the interview. We disagree with Penry's characterization of Fason's testimony as a "sham rebuttal" by the state in order to introduce to the jury the idea that Penry was a "psychopath." Penry's defense centered around his diminished capacity—his alleged mental retardation at the time of the offense—and the idea that his mental status rendered his confessions involuntary. Therefore, we conclude that the Court of Criminal Appeals's determination that Fason's testimony was proper rebuttal under *Buchanan* is neither contrary to nor an unreasonable application of clearly established federal law.[22]

### 2.

In addition to his challenge to Dr. Fason's guilt phase testimony, Penry also challenges the court's admission, at the punishment phase, of the testimony of Dr. Quijano and the report of Dr. Peebles as violating *Estelle.*

At the punishment phase, Penry called various relatives and neighbors who testified that they believed Penry was mentally retarded and abused as a child. He also called Dr. Randall Price, who had reviewed certain portions of Penry's medical records and administered various psychological tests to Penry. Dr. Price concluded that Penry had a brain impairment and was mentally retarded, and that the mental retardation could have influenced his involvement in criminal activity. Although he admitted that Penry had an antisocial history, he stated that Penry "looks more

---

21. 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987).

22. *See Vardas v. Estelle,* 715 F.2d 206, 209–10 (5th Cir.1983) (finding no violation of defendant's Fifth Amendment privilege because state psychiatrists' testimony was proper as rebuttal to defendant's insanity defense; psychiatrists testified that defendant was not insane, but instead was a sociopath.).

like people with brain damage ... than those with antisocial personality."

In rebuttal, the state called Doctors Quijano and Samenow and introduced into evidence a number of Penry's mental health records. Dr. Quijano conducted a court-ordered competency examination of Penry. He testified that Penry had an antisocial personality disorder which made him more likely to be violent in the future. However, he testified that he based his opinion only on Penry's medical records including evaluations by others, and not on his own examination of Penry. Thus, the Texas Court of Criminal Appeals found no Fifth Amendment violation. This finding was not contrary to, nor an unreasonable application of, clearly established federal law.[23]

 The report of Dr. Peebles was admitted into evidence during the punishment phase, and was based on Dr. Peebles's 1977 examination of Penry prior to his trial on an unrelated rape charge. The report determined that Penry would be dangerous in the future if released. At the time of Dr. Peebles's examination, Penry was not yet in custody on the instant capital charge and, thus, could not

have been warned about the potential use of his statements at the punishment phase of the capital trial. The Texas Court of Criminal Appeals found no Fifth Amendment violation because Penry's attorney had requested the examination; thus, Dr. Peebles was acting as an agent of the defense, not of the state in conducting his examination.[24] We cannot say that the court's conclusion was unreasonable or contrary to Supreme Court precedent.[25]

## B.

 Penry also argues that his Sixth Amendment right to effective assistance of counsel was violated by the use of testimony on future dangerousness from Doctors Quijano and Fason because Penry and his counsel were told that their examinations of him were solely for the purpose of determining competency. Under *Powell v. Texas*, "once a capital defendant is formally charged, the Sixth Amendment right to counsel precludes such an examination without first notifying counsel that 'the psychiatric examination [will] encompass the issue of their client's future dangerousness.'"[26] The Texas Court of Criminal

**23.** See *Williams v. Lynaugh*, 809 F.2d 1063, 1068 (5th Cir.1987) (finding no factual basis for Fifth Amendment violation where state psychologist's testimony on future dangerousness was not based on his interview with the defendant.) See also *Hughes v. Johnson*, 191 F.3d 607, 616–17 (5th Cir.1999) (finding reasonable a state court's conclusion that psychiatrist's testimony did not violate *Estelle*, despite his having conducted a prior improper interview, because it did not influence his testimony; also rejecting idea that "taint" of prior improper interview created absolute bar to any expression of opinion by that psychiatrist); cf. *Flores v. Johnson*, 210 F.3d 456, 462-70 (5th Cir.2000) (Emilio M. Garza, J., specially concurring) (following but questioning Supreme Court authority allowing psychiatric testimony on future dangerousness deduced without examining the defendant).

**24.** *Penry*, 903 S.W.2d. at 759–60; see *Nelson v. State*, 848 S.W.2d 126, 135 (Tex.Crim.App. 1992); *Estelle*, 451 U.S. at 467–68, 101 S.Ct. at 1875–76 (noting that the defendant there did not initiate the examination and was not

faced with a person acting solely in his interest).

**25.** See *Buchanan v. Kentucky*, 483 U.S. 402, 422–23, 107 S.Ct. 2906, 2917–18, 97 L.Ed.2d 336 (1987) (finding that "if a defendant requests [the psychiatric] evaluation *or* presents psychiatric evidence ... the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution."). (Emphasis added); see also *Schneider v. Lynaugh*, 835 F.2d 570, 577 (5th Cir.1988) (finding that, under *Buchanan*, the fact that defendant requested the competency examination militated against the defendant's assertion of the Fifth Amendment privilege, particularly when defendant had also introduced psychological evidence.).

**26.** 492 U.S. 680, 681, 109 S.Ct. 3146, 3148, 106 L.Ed.2d 551 (1989) (*quoting Estelle*, 451 U.S. at 471, 101 S.Ct. at 1877).

Appeals concluded that Penry's attorney was "on notice that if he intended to put on a 'mental status' defense, he would have to anticipate the use of psychological evidence by the prosecution in rebuttal."[27] At a pretrial hearing, the trial court expressly warned Penry's counsel that the testimony of Doctors Fason and Quijano might be admissible at trial if the defense put on psychiatric evidence.[28] At trial, Penry argued that he was mentally retarded; thus, his confessions were involuntary. He also argued that mental retardation could have been a contributing cause of Penry's violent criminal acts and that his mental retardation mitigated against the imposition of the death penalty. The state was entitled to rebut this evidence by offering psychiatric evidence that some condition other than mental retardation was a more sound explanation for Penry's conduct. Thus, the Court of Criminal Appeals's findings are not contrary to, nor an unreasonable application of, clearly established federal law.

## V

Penry next contends that his execution would violate the Eighth Amendment, based on his alleged mental retardation and severe child abuse. First, Penry makes a general argument that execution of the mentally retarded is a per se violation of the Eighth Amendment. We agree with the district court that this claim is procedurally barred because Penry did not make the argument in state court. However, even if this claim was not procedurally barred, it has been rejected by the Supreme Court.[29]

Penry also argues that the death penalty would be cruel and unusual as applied to him personally, because of his mental retardation and severe childhood abuse. This argument also fails. On Penry's direct appeal, the Texas Court of Criminal Appeals (*citing Penry I*) concluded that constitutional requirements were met because the jury was able to consider and give effect to Penry's mitigating evidence before determining that the death sentence was appropriate.[30] In Penry's second trial, he presented extensive mitigating evidence and the jury was instructed to consider that evidence and told how to give it effect. More significantly, although Penry was the individual before the Supreme Court in *Penry I*, the Court did not suggest that his execution would be unconstitutional based on his mental retardation or childhood abuse. The Texas Court of Criminal Appeals's conclusion that Penry's execution would not violate the Eighth Amendment was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

## VI

Penry makes several other arguments in support of his motion. He contends that: 1. the trial court violated his rights under *Simmons v. South Carolina*[31] by excluding his signed statement waiving any right to parole, while allowing the state to argue future dangerousness; 2. his confessions were taken involuntarily in violation of the Fifth Amendment; and 3. the jury instructions at his competency trial were unconstitutionally vague because they did not define the terms "reasonable," "rational," and "understanding." We find all of these arguments to be unpersuasive, essentially for the reasons given by the district court in its thorough opinion of March 29, 1999.

## VII.

For the reasons stated above, we deny Penry's motion for a certificate of appeala-

---

27. *Penry*, 903 S.W.2d at 758.

28. *Id.* at 759, n. 46.

29. *See Andrews v. Collins*, 21 F.3d 612, 632 (5th Cir.1994), cert. denied 513 U.S. 1114, 115 S.Ct. 908, 130 L.Ed.2d 790 (1995) (*citing Penry I*).

30. *Penry*, 903 S.W.2d at 766–67.

31. 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994).

bility. We also vacate the stay of execution previously entered by this court.

DENNIS, Circuit Judge, dissenting:

In *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) ("*Penry I* "), the Supreme Court held that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. "The sentencer must also be able to consider and give effect to that evidence in imposing sentence." *Id.* at 319, 109 S.Ct. 2934. Accordingly, the jury must be "instructed that it could consider the evidence offered by Penry as mitigating evidence and that it could give mitigating effect to that evidence in imposing sentence." *Id.* at 320, 109 S.Ct. 2934. The Court agreed with Penry "that his mitigating evidence of mental retardation and childhood abuse has relevance to his moral culpability beyond the scope of the special issues, and that the jury was unable to express its 'reasoned moral response' to that evidence in determining whether death was the appropriate punishment." *Id.* at 322, 109 S.Ct. 2934.

Moreover, in *Penry I*, the Court stated that in the absence of a special jury instruction "defining 'deliberately' in a way that would clearly direct the jury to consider fully Penry's mitigating evidence as it bears on his personal culpability ... a juror who believed that Penry's retardation and background diminished his moral culpability and made imposition of the death penalty unwarranted would be unable to give effect to that conclusion if the juror also believed that Penry committed the crime 'deliberately.' " *Id.* at 323, 109 S.Ct. 2934. Likewise, the Court observed, the mitigating evidence concerning Penry's mental retardation, which indicated his inability to learn from his mistakes, was relevant to the second issue only as an aggravating factor because it suggests a "yes" answer to the question of future dangerousness. *Id.* at 323, 109 S.Ct. 2934. Consequently, the Court concluded, the second special issue "did not provide a

vehicle for the jury to give mitigating effect to Penry's evidence of mental retardation and childhood abuse." *Id.* at 324, 109 S.Ct. 2934. With respect to the third special issue, the Court stated, a juror who found that Penry's mental retardation and arrested emotional development rendered him less culpable for his crime than a normal adult would not necessarily conclude that Penry's conduct was reasonable in response to the provocation, if any, by the deceased. "Thus", the Court reasoned, "a juror who believed Penry lacked the moral culpability to be sentenced to death could not express that view in answering the third special issue if she also concluded that Penry's action was not a reasonable response to provocation." *Id.* at 324–25, 109 S.Ct. 2934.

In light of the prosecutor's argument to the jurors that, under their oath to follow the law, they must follow the instructions they were given in answering the special issues, the Court concluded that, "in the absence of appropriate jury instructions, a reasonable juror could well have believed that there was no vehicle for expressing the view that Penry did not deserve to be sentenced to death based upon his mitigating evidence." *Id.* at 326, 109 S.Ct. 2934.

In *Penry I*, the State of Texas conceded at oral argument before the Supreme Court that if a juror concluded that Penry acted deliberately and was likely to be dangerous in the future, but also concluded that because of his mental retardation he was not sufficiently culpable to deserve the death penalty, that juror would be unable to give effect to that mitigating evidence under the instructions given in the case. *See id.* at 326, 109 S.Ct. 2934. Finally, the Court held that "[i]n this case, in the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused background by declining to impose the death penalty, we conclude that the jury was not provided with a vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision." *Id.* at 328, 109 S.Ct. 2934.

Justice Scalia, in his concurring and dissenting opinion in *Penry I*, criticized the majority's holding as follows:

> In providing for juries to consider all mitigating circumstances insofar as they bear upon (1) deliberateness, (2) future dangerousness, and (3) provocation, it seems to me Texas had adopted a rational scheme that meets the two concerns of our Eighth Amendment jurisprudence. The Court today demands that it be replaced, however, with a scheme that simply dumps before the jury all sympathetic factors bearing upon the defendant's background and character, and the circumstances of the offense, so that the jury may decide without further guidance whether he "lacked the moral culpability to be sentenced to death," *ante,* at 2950, "did not deserve to be sentenced to death," *ante,* at 2951, or "was not sufficiently culpable to deserve the death penalty," *ibid.* The Court seeks to dignify this by calling it a process that calls for a "reasoned moral response," *ante,* at 2949, 2951—but reason has nothing to do with it, the Court having eliminated the structure that required reason. It is an unguided, emotional "moral response" that the Court demands be allowed—an outpouring of personal reaction to all the circumstances of a defendant's life and personality, an unfocused sympathy.

*Id.* at 359–60, 109 S.Ct. 2934 (Scalia, J., concurring in part and dissenting in part).

The sentencing scheme and instructions adopted by Texas in Penry's second trial, the subject of the present case, do not satisfy the constitutional requirements described in *Penry I*. The jury was not clearly and directly instructed that it could consider and give effect to the mitigating evidence of Penry's mental retardation, organic brain damage and abused background as a whole and beyond the scope of the special issues by declining to impose the death penalty. Texas did not replace its sentencing scheme with one which puts "before the jury all sympathetic factors bearing upon the defendant's background and character, and the circumstances of the offense, so that the jury may decide without further guidance whether he 'lacked the moral culpability to be sentenced to death[.]'" *Id.* at 360, 109 S.Ct. 2934 (Scalia, J., concurring in part and dissenting in part). Instead, in the present case, the jury was instructed: "If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and therefore, give effect and consideration to them in assessing the defendant's personal culpability at the time you answer the special issue. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a negative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal culpability of the defendant, a negative finding should be given to one of the special issues." These instructions require the jury to consider and use only mitigating evidence relevant to the special issues, and permit the jury to decline to impose the death penalty only if that relevant mitigating evidence would cause the jury to change a "yes" answer to a "no." Therefore, the sentencing scheme used in Penry's second trial is subject to the same flaws pointed out by *Penry I*. It does not permit the jury to give effect to the mitigating evidence of retardation and abuse as a whole and beyond the scope of the special issues by declining to impose the death penalty despite its findings of "yes" to the three special issues questions. The jury's consideration of the mitigating evidence of mental retardation, organic brain damage and extensive child abuse is still shackled and confined within the scope of the three special issues. Therefore, the trial court failed to comply with the dictates of the Supreme Court and again deprived the jury of the ability to give full and complete effect to Penry's mitigating evidence of mental retardation, brain damage and child abuse.

The Supreme Court in *Penry I* held that the jury was not adequately instructed to

take into consideration all of Penry's mitigating evidence and that the terms in the Texas special issues were not defined in such a way that the jury could consider and give effect to all of his mitigating evidence in answering them. When the Court reversed and remanded for these reasons, the district court and this court became bound by the mandate rule. The mandate rule is not, strictly speaking, merely a matter of law of the case. *See United States v. Wells,* 519 U.S. 482, 488 n. 4, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997). On remand, the district court and the court of appeals owe obedience to the mandate of the Supreme Court and must carry it into effect. *See Vendo Co. v. Lektro-Vend Corp.,* 434 U.S. 425, 427–28, 98 S.Ct. 702, 54 L.Ed.2d 659 (1978) (once case is remanded, circuit court is bound by decree); MOORE'S FEDERAL PRACTICE 3D § 134.23[1][a].

Subsequently, the Supreme Court distinguished its holding from *Penry I* in cases involving other types of mitigating evidence. *See Johnson v. Texas,* 509 U.S. 350, 369, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) ("The evidence of petitioner's youth, however, falls outside Penry's ambit. Unlike Penry's mental retardation, which rendered him unable to learn from his mistakes, the ill effects of youth that a defendant may experience are subject to change and, as a result, are readily comprehended as a mitigating factor in consideration of the second special issue."); *Graham v. Collins,* 506 U.S. 461, 475–76, 113 S.Ct. 892, 122 L.Ed.2d 260 (1993) ("The jury was not forbidden to accept the suggestion of Graham's lawyers that his brief spasm of criminal activity in May 1981 was properly viewed, in light of his youth, his background, and his character, as an aberration that was not likely to be repeated. Even if Graham's evidence, like Penry's, had significance beyond the scope of the first special issue, it is apparent that Graham's evidence—unlike Penry's—had mitigating relevance to the second special issue concerning his likely future dangerousness. Whereas Penry's evidence compelled an affirmative answer to that inquiry, despite its mitigating significance, Graham's evidence quite readily could have supported a negative answer."). Accordingly, we are still bound by the mandate and the holding of *Penry I* and must carry them into effect now in the present case.

Moreover, there is no circuit precedent which prevents this panel from owing obedience to the mandate and holding of *Penry I.* In our prior decisions, *Penry I* was not applicable because the proffered evidence either was not constitutionally mitigating evidence [1] or was not beyond the scope of the special issues or beyond the effective reach of the jurors,[2] or because the claim was procedurally barred.[3]

In *Graham v. Collins,* 950 F.2d 1009 (5th Cir.1992) (en banc), this court explained that *Penry I* presented a "wholly different type of mitigating evidence. Not evidence of good character, but of bad character; not evidence of potential for rehabilitation, but of its absence; not evidence of a transitory condition, but of a permanent one; but nonetheless evidence which was strongly mitigating because these characteristics were due to the uniquely severe permanent handicaps with which the defendant was burdened through no fault of his own, mental retardation, organic brain damage and an abused childhood. There was no way this type of evidence could be given any mitigating force under the second special issue." *Id.* at 1029. This court in *Graham* observed that "*Penry* can fairly be read as

---

1. *See Madden v. Collins,* 18 F.3d 304, 308 (5th Cir.1994) (citing *Graham v. Collins,* 950 F.2d 1009, 1029 (5th Cir.1992) (en banc)).

2. *See Graham v. Collins,* 950 F.2d 1009, 1029 (5th Cir.1992) (en banc); *Miller v. Johnson,* 200 F.3d 274, 289–90 (5th Cir.2000).

3. *See Emery v. Johnson,* 139 F.3d 191, 199–200 (5th Cir.1997).

precluding use of the Texas statutory scheme in any such situation. But, *Penry* can also fairly be read as addressing only a situation where some major mitigating thrust of the evidence is substantially beyond the scope of any of the [special] issues." *Id.* at 1027. Consequently, the use of the Texas statutory scheme was precluded in Penry's situation and this panel has a duty to carry into effect the mandate and holding of *Penry I.* For these reasons, I would grant Penry's application for a COA.

I would also grant a certificate of appealability to consider the alleged violations of Penry's 5th and 6th Amendment rights. I share the concerns articulated by Judge Emilio M. Garza's special concurrence in *Flores v. Johnson,* 210 F.3d 456, 458–70 (5th Cir.2000) (Judge Emilio M. Garza, specially concurring) and believe that Penry has made a substantial showing that the cumulative effect and reinforcement of the prohibited use of the Texas statutory scheme by the erroneous admission of the psychiatric testimony further violated his constitutional rights.